**Nos. 15-1436 & 16-1037**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### PRIME HEALTHCARE CENTINELA, LLC
### d/b/a CENTINELA HOSPITAL MEDICAL CENTER

Petitioner/Cross-Respondent

v.

### NATIONAL LABOR RELATIONS BOARD

Respondent/Cross-Petitioner

and

### SEIU UNITED HEALTHCARE WORKERS-WEST

Intervenor

_____

### ON PETITION FOR REVIEW AND CROSS-APPLICATION
### FOR ENFORCEMENT OF AN ORDER OF
### THE NATIONAL LABOR RELATIONS BOARD

_____

### BRIEF FOR
### THE NATIONAL LABOR RELATIONS BOARD

_____

**ROBERT J. ENGLEHART**
*Supervisory Attorney*

**AMY H. GINN**
*Attorney*

***National Labor Relations Board***
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-2978**
**(202) 273-2942**

**RICHARD F. GRIFFIN, JR.**
        *General Counsel*
**JENNIFER ABRUZZO**
        *Deputy General Counsel*
**JOHN H. FERGUSON**
        *Associate General Counsel*
**LINDA DREEBEN**
        *Deputy Associate General Counsel*

**National Labor Relations Board**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for the National Labor Relations Board ("the Board") certify the following:

(A) <u>Parties and Amici</u>:  Prime Healthcare Centinela, LLC d/b/a Centinela Hospital Medical Center ("the Hospital"), petitioner/cross-respondent herein, was a respondent in the case before the Board.  The Board is the respondent/cross-petitioner herein, and the Board's General Counsel was a party in the case before the Board.  SEIU Healthcare Workers-West ("the Union"), intervenor herein, was the charging party before the Board.

(B) <u>Ruling Under Review</u>:  This case involves a petition for review and a cross-application for enforcement of a Board Decision and Order issued on November 24, 2015, and reported at 363 NLRB No. 44.  The Board seeks enforcement of that order against the Hospital.

(C) <u>Related Cases</u>:  This case was not previously before this Court or any other court.  Board counsel are unaware of any related cases currently pending before, or about to be presented before, this Court or any other court.

s/Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 17th day of June, 2016

# TABLE OF CONTENTS

**Headings**                                                                                          **Page(s)**

Statement of subject matter and appellate jurisdiction ................................................1

Statement of the issues presented ...........................................................................3

Relevant statutory provisions.................................................................................3

Statement of the case............................................................................................3

I.  Procedural history ...........................................................................................3

II. The Board's findings of fact ............................................................................4

    A. Prime Healthcare's operations; the Hospital and Union begin bargaining
       for a successor collective-bargaining agreement ...................................... 4

    B. The parties bargain over changes to the existing healthcare plans ........... 5

    C. The Hospital proposes a new EPO medical plan; the Union expresses
       concerns about quality of care and cost to employees ............................. 6

    D. The Hospital wants to implement the EPO plan before a complete
       contract is negotiated; the Union raises issues of access to physicians
       and quality of care under the EPO plan..................................................... 6

    E. The Hospital includes a requirement in its EPO proposal that employees
       must always see a Prime physician first; the Union counters that
       employees can select a non-Prime primary care physician; the Hospital
       rejects that proposal.................................................................................. 8

    F. The Union requests information relating to quality of care at Prime
       hospitals; the Hospital refuses to provide any of the information; the
       Union responds; the Hospital ultimately provides none of the
       information ............................................................................................... 9

    G. The Hospital announces to employees that new EPO and PPO plans will
       begin on January 1, 2011 following a November 2010 open enrollment
       period; the parties trade healthcare proposals .......................................... 11

# TABLE OF CONTENTS

**Headings-Cont'd**                                                              **Page(s)**

    H. The Hospital declares impasse and gives the Union a final offer; the
       Union disagrees as to impasse and states quality of care concerns; the
       parties reach agreement on two non-healthcare articles......................... 12

    I. The Hospital sends the Union a last, best, and final offer expiring on
       December 31; the Union does not accept citing no impasse and its
       outstanding information request; the Hospital implements its new
       healthcare plan......................................................................................... 13

    J. The Hospital and Union resume bargaining; the Union makes proposals;
       the Hospital will not modify its last, best, and final offer and makes
       further bargaining contingent on the Union accepting that offer........... 13

III. The Board's decision and order .......................................................................14

Summary of argument..........................................................................................15

Standard of review ..............................................................................................18

Argument...............................................................................................................19

I. Substantial evidence supports the Board's finding that the Hospital violated
  Section 8(a)(5) and (1) of the Act by failing to provide the Union with relevant
  information requested to evaluate the Hospital's healthcare proposal ................19

    A. Applicable principles regarding the duty to provide requested
      information....................................................................................................19

    B. The Board reasonably determined based on substantial evidence that the
      Hospital violated Section 8(a)(5) and (1) of the Act by failing to provide
      the requested information because the information is relevant to the
      bargaining process .....................................................................................21

    C. The Hospital's objections to the Board's relevance findings are
      insufficient to overcome the Union's minimal burden.............................24

    D. The Board properly rejected the Hospital's assertion that the Union's
      information request was made in bad faith................................................26

ii

# **TABLE OF CONTENTS**

**Headings-Cont'd**                                                                                          **Page(s)**

II. The Board is entitled to summary enforcement of its uncontested finding that the Hospital violated Section 8(a)(5) and (1) of the Act by unilaterally announcing it would be implementing new healthcare plans ............................31

III. Substantial evidence supports the Board's finding that the Hospital violated Section 8(a)(5) and (1) of the Act by unilaterally implementing its healthcare proposal without bargaining to impasse ............................................................32

    A. The Board reasonably found that the Hospital's unlawful conduct during bargaining precludes a finding of impasse ...................................33

        1. Applicable principles of unremedied unfair labor practices precluding impasse .........................................................................33

        2. The Board correctly found that the Hospital's uncontested unilateral announcement of its EPO plan to employees and its failure to provide relevant information precludes a finding of impasse ....................................................................................35

            i.   The Hospital's failure to provide requested information precludes a finding of impasse ...........................................35

            ii.   The Hospital's unilateral announcement tainted further negotiations ........................................................................37

    B. The Board reasonably found that the totality of circumstances precludes a finding of lawful impasse ....................................................39

        1. Applicable principles of bargaining to impasse ...........................39

        2. The Board reasonably found that the totality of circumstances fails to show the parties reached impasse before the Hospital implemented its EPO plan..............................................................41

            i.   Substantial evidence supports the Board's finding that the Hospital failed to establish that impasse was reached on the critical issue of healthcare....................................................42

# **TABLE OF CONTENTS**

**Headings-Cont'd**                                                                    **Page(s)**

ii.    The Board reasonably found that the Hospital failed to demonstrate an overall breakdown in bargaining ...............43

iii.    The Hospital's uncontested unlawful conduct in bargaining further supports the Board's finding of no impasse ...........46

iv.    The Hospital's additional arguments do not demonstrate that a good faith impasse was reached................................47

Conclusion ............................................................................................52

iv

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*ABC Auto. Products Corp.,*
  307 NLRB 248 (1992) ..................................................... 38

*\*Alwin Mfg. Co. v. NLRB,*
  192 F.3d 133 (D.C. Cir. 1999)........................................ 33, 34, 35, 39

*\*Am. Fed'n of Television & Radio Artists v. NLRB,*
  395 F.2d 622 (D.C. Cir. 1968)........................................ 35, 40, 46

*Atl. Queens Bus Corp.,*
  362 NLRB No. 65 (2015) ................................................... 44

*Aztec Bus Lines, Inc.,*
  289 NLRB 1021 (1988) ..................................................... 22

*Bally's Park Place, Inc. v. NLRB,*
  646 F.3d 929 (D.C. Cir. 2011)........................................... 18

*Bell Transit Co.,*
  271 NLRB 1272 (1985), *reversed sub. nom,*
  *Teamsters Local Union No. 175 v. NLRB*, 788 F.2d 27 (D.C. Cir. 1986)............ 50

*Beverly Farm Foundation v. NLRB,*
  144 F.3d 1048 (7th Cir. 1998) ........................................... 45

*Bloomsburg Craftsmen,*
  276 NLRB 400 (1985) ...................................................... 48

*Calmat Co.,*
  331 NLRB 1084 (2000) .................................................. 42, 43

*Carpenters & Millwrights, Local Union 2471 v. NLRB,*
  481 F.3d 804 (D.C. Cir. 2007)........................................... 31

_____

\* Authorities upon which we chiefly rely are marked with asterisks.

v

## TABLE OF AUTHORITIES

**Cases - Cont'd**                                                                            **Page(s)**

*Chicago Local No. 458-3M, Graphic Comm'ns Int'l Union v. NLRB,*
206 F.3d 22 (D.C. Cir. 2000) ............................................................... 45

*Cintas Corp. v. NLRB,*
589 F.3d 905 (8th Cir. 2009) .............................................................. 27

*Columbus Products Co.,*
259 NLRB 220 (1981) ................................................................... 25, 26

*Comau, Inc. v. NLRB,*
671 F.3d 1232 (D.C. Cir. 2012) .......................................................... 47

*Cone Mills Corp. v. NLRB,*
413 F.2d 445 (4th Cir. 1969) ............................................................. 34

*Country Ford Trucks, Inc. v. NLRB,*
229 F.3d 1184 (D.C. Cir. 2000) ................................................. 20, 22, 25

*Crowley Marine Servs. v. NLRB,*
234 F.3d 1295 (D.C. Cir. 2000) ..................................................... 21, 24

*Dallas Gen. Drivers v. NLRB,*
355 F.2d 842 (D.C. Cir. 1966) ........................................................... 41

*Decker Coal Co.,*
301 NLRB 729 (1991) ..................................................................... 34

*Detroit Newspaper Printing & Graphic Communications Union v. NLRB,*
598 F.2d 267 (D.C. Cir. 1979) ........................................................... 21

*E. I. Du Pont De Nemours & Co.,*
268 NLRB 1075 (1984) ................................................................... 51

_____

* Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES

**Cases - Cont'd**                                   **Page(s)**

*E.I. Du Pont de Nemours & Co. v. NLRB,*
  489 F.3d 1310 (D.C. Cir. 2007)...............................................34, 36, 37

*Exxon Chem. Co. v. NLRB,*
  386 F.3d 1160 (D.C. Cir. 2004)....................................................20, 32

*Fallbrook Hosp. Corp. v. NLRB,*
  785 F.3d 729 (D.C. Cir. 2015)......................................................31, 47

*Flying Food Group, Inc. v. NLRB,*
  471 F.3d 178 (D.C. Cir. 2006)............................................................31

*Ford Motor Co. v. NLRB,*
  441 U.S. 488 (1979)..........................................................................18

*Fox v. Gov't of D.C.,*
  794 F.3d 25 (D.C. Cir. 2015)............................................................30

*Graphic Communications Workers v. NLRB,*
  977 F.2d 1168 (7th Cir. 1992)...........................................................27

*Grinnell Fire Protection Syst. Co.,*
  328 NLRB 585 (1999).......................................................................46

*Honda of Hayward,*
  314 NLRB 443 (1994).......................................................................22

*Honeywell Int'l, Inc. v. NLRB,*
  253 F.3d 125 (D.C. Cir. 2001)....................................................32, 39

*Litton Fin. Printing Div. v. NLRB,*
  501 U.S. 190 (1991)..........................................................................32

---

\* Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES

**Cases -Cont'd**                                                                 **Page(s)**

*Matanuska Electrical Ass'n,*
  337 NLRB 680 (2002) ....................................................... 50

*May Dep't Stores Co. v. NLRB,*
  326 U.S. 376 (1945)......................................................... 38

*Metropolitan Edison Co. v. NLRB,*
  460 U.S. 693 (1983)......................................................... 20

*\*Monmouth Care Ctr. v. NLRB,*
  672 F.3d 1085 (D.C. Cir. 2012).............................................. 19, 34, 40, 41, 45, 47

*\*N.Y. & Presbyterian Hosp. v. NLRB,*
  649 F.3d 723 (D.C. Cir. 2011)........................................ 19, 20, 21, 22, 24, 25, 26

*New Surfside Nursing Home,*
  330 NLRB 1146 (2000) ...................................................... 24

*\*NLRB v. Acme Indus. Co.,*
  385 U.S. 432 (1967).................................................... 19, 20, 21, 23, 24

*NLRB v. Katz,*
  369 U.S. 736 (1962)......................................................... 32

*Oil, Chem. & Atomic Workers Local Union No. 6–418 v. NLRB,*
  711 F.2d 348 (D.C. Cir. 1983)............................................. 19, 20, 21

*Olivetti Office U.S.A., Inc. v. NLRB,*
  926 F.2d 181 (2d Cir. 1991) ................................................ 34

*Powell Elec. Mfg. Co.,*
  287 NLRB 969 (1987), *enforced*,
  906 F.2d 1007 (5th Cir. 1990) ............................................. 39

_____

\* Authorities upon which we chiefly rely are marked with asterisks.

## TABLE OF AUTHORITIES

**Cases - Cont'd**                                                    **Page(s)**

*PRC Recording Co.,*
 280 NLRB 615 (1986) ........................................................ 46

*Raven Servs. Corp. v. NLRB,*
 315 F.3d 499 (5th Cir. 2002) ............................................. 34

*Sure-Tan, Inc. v. NLRB,*
 467 U.S. 883 (1984) ........................................................... 18

*Taft Broad. Co.,*
 163 NLRB 475 (1967), *petition for review denied sub nom.,*
 *Am. Fed'n of Television & Radio Artists v. NLRB,* 395 F.2d 622
 (D.C. Cir. 1968) ........................................................ 40, 45

*\*Teamsters Local Union No. 175 v. NLRB,*
 788 F.2d 27 (D.C. Cir. 1986) .......................... 39, 40, 44, 50

*\*Teamsters Local Union No. 639 v. NLRB,*
 924 F.2d 1078 (D.C. Cir. 1991) ............................ 40, 43, 47

*\*U.S. Testing Co. v. NLRB,*
 160 F.3d 14 (D.C. Cir. 1998) ............................ 30, 34, 36, 37

*UFCW, Local 204 v. NLRB,*
 506 F.3d 1078 (D.C. Cir. 2007) .......................................... 18

*Universal Camera Corp. v. NLRB,*
 340 U.S. 474 (1951) ...................................................... 18, 49

*\*Wayneview Care Ctr. v. NLRB,*
 664 F.3d 341 (D.C. Cir. 2012) .................... 18, 25, 40, 41, 47

_____

* Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES

**Statutes:**                                                                    **Page(s)**

National Labor Relations Act, as amended
  (29 U.S.C. § 151 et seq.)

Section 7 (29 U.S.C. § 157) ............................................................ 14, 20
Section 8(a)(1) (29 U.S.C. § 158(a)(1)) ................. 2-4, 14-16, 19-21, 31, 32, 37, 47
Section 8(a)(5) (29 U.S.C. § 158(a)(5)) ................. 2-4, 14-16, 19-21, 31, 32, 37, 47
Section 10(a) (29 U.S.C. § 160(a)) ......................................................... 2
Section 10(e) (29 U.S.C. § 160(e)) ..................................................... 2, 18
Section 10(f) (29 U.S.C. § 160(f)) ......................................................... 2

---

\* Authorities upon which we chiefly rely are marked with asterisks.

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

### Nos. 15-1436 & 16-1037
_____

## PRIME HEALTHCARE CENTINELA, LLC
## d/b/a CENTINELA HOSPITAL MEDICAL CENTER

**Petitioner/Cross-Respondent**

**v.**

## NATIONAL LABOR RELATIONS BOARD

**Respondent/Cross-Petitioner**

**and**

## SEIU UNITED HEALTHCARE WORKERS-WEST

**Intervenor**
_____

## ON PETITION FOR REVIEW AND CROSS-APPLICATION
## FOR ENFORCEMENT OF AN ORDER OF
## THE NATIONAL LABOR RELATIONS BOARD
_____

## BRIEF FOR
## THE NATIONAL LABOR RELATIONS BOARD
_____

## STATEMENT OF SUBJECT MATTER AND
## APPELLATE JURISDICTION

This case is before the Court on the petition of Prime Healthcare Centinela,

LLC d/b/a Centinela Hospital Medical Center ("the Hospital") to review, and on

the cross-application of the National Labor Relations Board ("the Board") to

enforce, a Board Order issued against the Hospital on November 24, 2015, and

reported at 363 NLRB No. 44.  (D&O 1-32.)[1]  The Board found that the Hospital

violated Section 8(a)(5) and (1) of the National Labor Relations Act (29 U.S.C. §§

151, §158 (a)(5) and (1)) ("the Act") by failing and refusing to bargain

collectively with SEIU Healthcare Workers-West ("the Union").

The Board had subject matter jurisdiction over the unfair labor practice

proceeding under Section 10(a) of the Act (29 U.S.C. §160(a)).  The Board's Order

is final with respect to all parties under Section 10(e) and (f) of the Act (29 U.S.C.

§ 160(e) and (f)).

The Court has jurisdiction over this proceeding pursuant to Section 10(f) of

the Act (29 U.S.C. § 160(f)), which provides that petitions for review of Board

orders may be filed in this Court, and Section 10(e) (29 U.S.C. § 160(e)), which

allows the Board, in those circumstances, to cross-apply for enforcement.  The

Hospital filed its petition for review on December 2, 2015.  The Board filed its

cross-application for enforcement on February 5, 2016.  Both filings were timely;

---

[1]  Citations are to the original record; the deferred appendix will be filed on July
15, 2016.  "D&O" refers to the Board's Decision and Order.  "Tr." refers to the
transcript of the unfair labor practice hearing held before the administrative law
judge.  "GCX" and "RX" refer to exhibits introduced at the hearing by the Board's
General Counsel and the Hospital (the Respondent below) respectively.
References preceding a semicolon are to the Board's findings; those following are
to the supporting evidence.

the Act places no limit on the time for filing actions to review or enforce Board

orders.

## STATEMENT OF THE ISSUES PRESENTED

1.  Whether substantial evidence supports the Board's finding that the

Hospital violated Section 8(a)(5) and (1) of the Act by failing to provide the Union

with relevant information requested to evaluate the Hospital's healthcare

proposals.

2.  Whether the Board is entitled to summary enforcement of its uncontested

finding that the Hospital violated Section 8(a)(5) and (1) of the Act by unilaterally

announcing it would be implementing its new healthcare plan.

3.  Whether substantial evidence supports the Board's finding that the

Hospital violated Section 8(a)(5) and (1) of the Act by unilaterally implementing

its healthcare proposal without bargaining to impasse.

## RELEVANT STATUTORY PROVISIONS

Relevant sections of the National Labor Relations Act are reproduced in the

Addendum to this brief.

## STATEMENT OF THE CASE

## I.  PROCEDURAL HISTORY

Based upon charges filed by the Union, the Board's General Counsel issued

a complaint alleging that the Hospital violated Section 8(a)(5) and (1) of the Act

4

(29 U.S.C. § 158(a)(5) and (1)) by its conduct during negotiations for a successor

collective-bargaining agreement.  The complaint alleged that the Hospital failed to

provide the Union with requested information necessary for bargaining,

unilaterally announced and implemented changes in terms of employment,

specifically healthcare coverage, absent a bargaining impasse, and engaged in bad-

faith bargaining by conditioning further bargaining on the Union's acceptance of

the Hospital's last, best, and final offer.

Following a hearing, a Board administrative law judge found that the

Hospital committed the violations as alleged.[2]  The Hospital filed exceptions.  The

Board affirmed the judge's unfair labor practice rulings, findings, and conclusions,

and adopted his recommended remedial Order as modified.  (D&O 1.)

## II.  THE BOARD'S FINDINGS OF FACT

### A.  Prime Healthcare's Operations; the Hospital and Union Begin Bargaining for a Successor Collective-Bargaining Agreement

Prime operates 18 hospitals, primarily in California, including the Centinela

Hospital Medical Center.[3]  The Union has represented a unit of maintenance,

technical, skilled maintenance, and business office clerical employees at Centinela

---

[2] The parties reached a settlement agreement as to additional complaint allegations
that were subsequently withdrawn and are therefore not before the Court.  (D&O 6
n.2.)

[3] Prime Healthcare's operations are detailed as of the time of the hearing in this
case.

since 2003.  (D&O 1, 7-8; GCX 4, Tr. 563.)  In December 2009, the Hospital and

the Union began negotiating for a successor collective-bargaining agreement to an

agreement that expired on December 31.  Between December 2009 and March

2011, Daniel Bush served as chief negotiator for the Union.  From February 2010

to December 2011, Mary Schottmiller served as chief negotiator for the Hospital.

(D&O 8; Tr. 68, 70-71, 563.)

### B.  The Parties Bargain over Changes to the Existing Healthcare Plans

A main issue during bargaining was the employee healthcare plan.  Under

the expiring contract, the Hospital offered employees a choice of an HMO (Health

Maintenance Organization) and a PPO (Preferred Provider option) plan through a

contracted insurance provider, Anthem Blue Cross.  The Hospital's plans were

"fully funded," such that the Hospital paid a premium for each employee and

Anthem was responsible for insurance risk by fully funding any insurance claims

made by employees.  Employees were only required to contribute to premiums for

the PPO options; the HMO plans were free to employees for any level of coverage

whether individual or family.  Employees were not required to use, and generally

did not have access to, Prime's own hospitals.  (D&O 8; Tr. 72-73, 80.)  In

December 2009, the Hospital made its first bargaining proposal on healthcare and

kept the existing HMO/PPO structure with some proposed modifications.  (D&O

8; GCX 16, Tr. 77, 331.)

### C.  The Hospital Proposes a New EPO Medical Plan; the Union Expresses Concerns About Quality of Care and Cost to Employees

In February 2010, the Hospital proposed, in lieu of the existing HMO plan, a new EPO (Exclusive Provider Option) plan.  Under the EPO plan, administered and self-funded by the Hospital, the Prime network would become employees' primary healthcare provider.  (D&O 9; Tr. 80.)  In the Hospital's initial EPO proposal, employees would retain access to doctors in the broader Anthem HMO network but copays and deductibles would be cheaper for Prime hospitals and physicians.  (D&O 9; GCX 18, Tr. 88.)  The EPO plan would require employees to pay premiums except for the employee-only option.[4]  (D&O 1, 9; GCX 18.)  When the Hospital proposed the EPO plan, the Union expressed concerns about quality of care at Prime hospitals as well as concerns about increased costs to employees under the Hospital's proposal.  (D&O 1,9, Tr. 89.)

### D.  The Hospital Wants To Implement the EPO Plan Before a Complete Contract Is Negotiated; the Union Raises Issues of Access to Physicians and Quality of Care Under the EPO Plan

On March 26, Schottmiller sent an email to Bush stating that the Hospital wanted to "roll out" the new EPO plan by July 1.  (D&O 9; GCX 21.)  This was the first instance in which the Union was made aware that the Hospital wanted to implement its healthcare proposal before an overall collective-bargaining

_____

[4] The EPO premiums were set at biweekly contributions of $75 for employee + spouse, $60 for employee + child, and $150 for employee + family.  (D&O 9; GCX 18.)

agreement was reached. (D&O 9; Tr. 98.) On April 19, Bush replied to Schottmiller, rejecting the Hospital's proposal and seeking continued bargaining on the subject. (D&O 9; GCX 22.) Schottmiller responded with a commitment to continue negotiating over the subject of healthcare and committing to pay 100 percent of out-of-pocket costs for employees until agreement or impasse was reached. (D&O 9; RX 42.) On April 23, Schottmiller sent a follow-up letter to Bush regarding upcoming bargaining and noting that "a final complete contract is dependent on resolving [the healthcare] issue." (D&O 9-10; GCX 23.)

On May 3, the parties held a bargaining session focused on healthcare with discussions of how the EPO plan would work and concerns about plan costs including employee premiums. The parties also discussed concerns about the size of the Prime network and concerns that it did not have a lot of pediatricians or gynecologists so that employees would still need access to the Anthem network without a referral. (D&O 10; Tr. 105-06, 595, 686-87.) On May 4, Bush wrote to Schottmiller requesting information about how the self-funded plan would operate and the quality of care at Prime hospitals. (D&O 10; GCX 26.) The Hospital responded with some of the requested information but stated that it would not provide information related to inpatient discharges for reasons of relevance. (D&O 10; GCX 27.)

8

### E.  The Hospital Includes a Requirement in Its EPO Proposal that Employees Must Always See a Prime Physician First; the Union Counters that Employees Can Select a Non-Prime Primary Care Physician; the Hospital Rejects that Proposal

At a bargaining session on May 6, the Hospital first made the Union aware that, under the EPO plan proposal, participants would be required to obtain a referral from their Prime primary care physician before seeing any doctor in the Anthem network.  (D&O 10; GCX 29, Tr. 117-18.)

During bargaining sessions on June 14 and 15, the Union presented a healthcare proposal accepting the Hospital's EPO plan contingent on there being no employee premiums at any level of coverage.  The Union further proposed that employees be able to select a primary care physician from either the Prime or Anthem networks.  The Union also included a proposal for both a high and low PPO option.  (D&O 10; GCX 30.)

At a July 23 bargaining session, the Hospital presented a counterproposal on healthcare that maintained but lowered the EPO plan contributions from employees at all levels and rejected the Union's proposal to access the Anthem network without having to incur a referral expense through a gatekeeper.  (D&O 11; GCX 35, Tr. 136.)

### F. The Union Requests Information Relating to Quality of Care at Prime Hospitals; the Hospital Refuses to Provide Any of the Information; the Union Responds; the Hospital Ultimately Provides None of the Information

On July 23, the Union gave a letter to the Hospital requesting information about the quality of care at Prime hospitals. The Union stated that the information was "both relevant and absolutely necessary for the Union to properly evaluate the EPO proposal and possible changes to the level of care the employees who select health insurance coverage from Prime may face." (D&O 11; GCX 33, Tr. 130.) The Union requested the most recent PEPPER ("Program for Evaluating Payment Patterns Electronic Report") reports for each hospital as well as any correspondence with the state Quality Improvement Organization regarding those reports. The Union also sought all-payor claims data and hospital occupancy rates per month for a defined time period. The Union requested information about pressure ulcers, rates of septicemia, and other hospital-acquired infections including the content of all trainings given to employees regarding proper cleaning of surfaces that may contain infectious agents and prevention and treatment of pressure ulcers. The Union requested information about coding consultants used by Prime and their applicable guidelines and training materials. The Union further requested a list of Nurse Practitioners and Physician Assistances serving as hospitalists. (D&O 2, 11-12; GCX 33.) Finally, the Union offered to bargain with

the Hospital regarding the rejection or modification of any of its information requests.  (D&O 12; GCX 33.)

On August 9, the Hospital refused to provide any of the requested information.  As to certain items, the Hospital objected on the basis that they were irrelevant to quality of care or that the Union sought confidential information including some information that "impinged upon statutory patient privacy rights." The Hospital also contended that the information request was part of a campaign against the Hospital focusing on high septicemia rates at Prime's hospitals (D&O 1, 12; GCX 36.)

On August 17, the Union responded via letter setting forth, request by request, the reasons for seeking the information and why it was relevant and necessary.  The Union stated that information requests were relevant because the employees' current healthcare options did not include any Prime hospitals and thus the employees had no experience with Prime hospitals or physicians, which they would now be strongly encouraged to use due to the substantial expense of pursuing healthcare outside the Prime network.  (D&O 2, 13; GCX 37.)  The parties exchanged additional correspondence relating to the July 23 information request but the Hospital provided none of the requested information.  (D&O 13-14; GCX 39, 41-42.)

**G. The Hospital Announces to Employees that New EPO and PPO Plans Will Begin on January 1, 2011 Following a November 2010 Open Enrollment Period; the Parties Trade Healthcare Proposals**

On September 1, the Hospital announced in a memo to employees that it would offer only the new EPO and PPO plans beginning January 1, 2011. The Hospital further told employees in the memo that there would be a November 2010 open enrollment period. The Hospital included with the memo a copy of a doctor nomination form instructing employees to fill out and submit the forms by October 1. (D&O 14; GCX 42A.)

On September 2, Bush emailed Schottmiller indicating that he had been out of town and upon his return had seen an August 23 letter from her concerning the physician nomination forms. (D&O 14; GCX 38, 40.) Bush requested that the Hospital not distribute the nomination form without first negotiating with the Union. Schottmiller responded that she did not know Bush had been out of town and the nomination forms had already been sent to employees. (D&O 14; GCX 40.)

On September 27, the Hospital conducted an employee forum to inform employees about the new healthcare plan. The Hospital informed employees that, during open enrollment, they would have to choose between the EPO and Anthem plans. If they did not choose a plan, they would automatically be added to the EPO

plan and their dependent(s)' coverage would be discontinued.  (D&O 14; Tr. 510-14, 521, 528-29.)

At a bargaining session on September 30, the Hospital rejected a Union proposal for high and low PPO plans, instead proposing a single PPO option. (D&O 14; GCX 43-44, Tr. 185, 188.)  The Union rejected this proposal and altered an earlier proposal to no longer seek a reduction in the outpatient copay for mental health benefits.  (D&O 14; GCX 46, Tr. 192.)

### H.  The Hospital Declares Impasse and Gives the Union a Final Offer; the Union Disagrees as to Impasse and States Quality of Care Concerns; the Parties Reach Agreement on Two Non-Healthcare Articles

On October 21, the Hospital declared impasse and presented a "Final Offer" to the Union.  (D&O 1, 15; GCX 48, Tr. 196.)  The Hospital contended that the parties were at impasse with respect to healthcare and the entire contract.  The Union disagreed with the Hospital's declaration of impasse citing recent changes the Hospital had made to its most current final offer.  The Union reiterated its concerns about the number of doctors in the Prime network and the quality of care at Prime hospitals.   (D&O 15; Tr. 196-97, 212.)

On healthcare, the Hospital's final offer included high and low PPO options as well as the EPO plan with a gatekeeper requirement and employee premiums at all levels of coverage.  On employee pay raises, the Hospital's final offer provided that raises would be provided "on the date of contract ratification."  (D&O 2; GCX

48.)  At the October 21 bargaining session, the parties reached agreement on management rights and subcontracting articles.  (D&O 15; RX 105.)

### I.  The Hospital Sends the Union a Last, Best, and Final Offer Expiring on December 31; the Union Does Not Accept Citing No Impasse and Its Outstanding Information Request; the Hospital Implements Its New Healthcare Plan

On December 15, the Hospital modified its final offer by sending the Union a "last, best and final offer" with a requirement that the Union accept the offer by December 31.  In its offer, the Hospital changed the date of employee pay raises from the date of contract ratification to a retroactive date of July 1, 2010.  (D&O 2, 15; GCX 52.)  The Union did not accept this offer and continued to state that the parties were not at impasse and the Union was waiting for information it requested to evaluate the Hospital's proposals.  The Union also indicated that it was willing to bargain.  (D&O 15; GCX 54-55.)

On January 1, 2011, the Hospital implemented the new EPO and PPO plans. (D&O 2.)

### J.  The Hospital and Union Resume Bargaining; the Union Makes Proposals; the Hospital Will Not Modify Its Last, Best, and Final Offer and Makes Further Bargaining Contingent on the Union Accepting that Offer

The parties resumed bargaining in March 2011.  At a March 29 bargaining session, the Union made four bargaining proposals on employee status, compensation, vacation, and sick leave benefits.  (D&O 15; GCX 59, Tr. 229.)

Throughout further correspondence and bargaining sessions, the Union continued to reiterate that the parties were not at impasse while the Hospital maintained that it would not modify the fundamental components of its last, best, and final offer. (D&O 15-16; GCX 60-61, 65-69, Tr. 230, 232, 236, 412, 426.)

The parties held their final bargaining session on December 22, 2011.  The parties were scheduled to meet in January 2012.  (D&O 16; Tr. 431, 435, 439.) However, the Hospital declared that further bargaining was contingent upon the Union accepting the Hospital's last, best, and final offer and no further meetings took place.  (D&O 16; GCX 73-75, Tr. 440.)

### III.  THE BOARD'S DECISION AND ORDER

The Board (Chairman Pearce and Members Miscimarra and Hirozawa) found that the Hospital violated Section 8(a)(5) and (1) of the Act (29 U.S.C. § 158(a)(5) and (1)) by failing to provide the Union with relevant information, announcing and implementing changes to employees' terms and conditions of employment without bargaining to impasse, and unlawfully conditioning bargaining on the Union's acceptance of its last, best, and final offer.  (D&O 4-5.) To remedy these violations, the Board's Order requires the Hospital to cease and desist from the unfair labor practices found and from, in any like or related manner, interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act (29 U.S.C. §157).  (D&O 4-5.)

15

Affirmatively, the Board's Order requires the Hospital to provide the Union with the requested information that is relevant and necessary to evaluate the Hospital's healthcare EPO proposal, as identified in the Union's July 2010 information request, to the fullest extent allowed by law.  Additionally, upon the Union's request, the Hospital must rescind the unilaterally implemented changes in unit employees' healthcare coverage, copays, premiums, and healthcare provider networks, as well as make unit employees whole for any losses they may have suffered as a result of the unilateral changes.  Further, before implementing any changes in wages, hours, or other terms or conditions of employment, the Hospital must notify and, on request, bargain with the Union.  Finally, the Hospital must post a remedial notice.  (D&O 5.)

## SUMMARY OF ARGUMENT

1.    The Board reasonably found that the Hospital violated Section 8(a)(5) and (1) of the Act by failing to provide the Union with relevant information it requested to evaluate the Hospital's healthcare proposals.  In negotiations for a successor collective-bargaining agreement, the Hospital proposed ending its HMO healthcare plan and changing it to a self-funded EPO plan.  Under the EPO, employees would utilize Prime hospitals and doctors and pay expanded premiums for coverage.  The EPO plan also included a gatekeeper function whereby the employees would have to see a Prime physician before being referred out of

network.  The Union expressed concerns about quality of care at Prime hospitals

and, in order to evaluate the Hospital's healthcare proposal, submitted a request for

information about those hospitals, which included information about infection rates

and related staff training.  The Board reasonably determined that the Hospital had a

duty to provide that information and unlawfully failed to do so.

The Board properly rejected as unsupported by the record the Hospital's

contention that the Union's information request was made in bad faith or that the

Union made the request to further a corporate campaign against Prime.  The Board

further rejected the Hospital's assertion that the Union did not need the information

because the Union agreed to an EPO plan at different Prime hospitals in different

geographic locations as the Board recognized that unit employees here had no prior

experience using the Prime healthcare network.

2.      In its opening brief, the Hospital does not contest the Board's finding that it

violated Section 8(a)(5) and (1) of the Act when, in the absence of an agreement

with the Union, it unilaterally announced to employees that the Hospital would

implement new EPO and PPO plans that would take effect in January 2011.

Therefore, under well-settled law, the Board is entitled to summary enforcement of

its finding.

3.      Substantial evidence supports the Board's finding that the Hospital violated

Section 8(a)(5) and (1) of the Act by unilaterally implementing its healthcare

proposal without bargaining to impasse. It is undisputed that the Hospital

unilaterally implemented those plans, but the Hospital argues that it was privileged

to do so because the parties' negotiations were at a good-faith impasse. The Board

rejected the Hospital's assertion of a good-faith impasse on two independent and

well-founded bases, either of which is sufficient to support the Board's conclusion.

First, the Board found the Hospital's unremedied unfair labor practices—its

failure to provide relevant information and its unilateral announcement of its intent

to replace the employees' healthcare plans without bargaining with the Union—to

be conduct inconsistent with the conditions in which a good-faith impasse can

arise. Second, based on substantial record evidence and well-settled law, the

Board found that, even apart from the unremedied unfair labor practices, the

totality of circumstances failed to show the parties reached impasse. Specifically,

the Board found that the parties had not reached impasse on the critical issue of

healthcare coverage nor, even if they had, did it lead to an overall breakdown in

bargaining. Additionally, the Hospital's further uncontested, unlawful conduct of

making bargaining contingent on the Union's acceptance of the Hospital's last,

best, and final offer demonstrated bad faith that further supported the absence of a

good-faith impasse.

# STANDARD OF REVIEW

The Board's interpretation of the Act must be upheld if reasonably defensible.  *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 891 (1984).  As the Supreme Court has observed, "Congress made a conscious decision" to delegate to the Board "the primary responsibility of marking out the scope of the statutory language and of the statutory duty to bargain."  *Ford Motor Co. v. NLRB*, 441 U.S. 488, 496 (1979).

The Board's factual findings "shall be conclusive" if they are "supported by substantial evidence on the record considered as a whole."  29 U.S.C. § 160(e); *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2012).  Evidence is substantial when "a reasonable mind might accept [it] as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  A reviewing court may not displace the Board's choice between two fairly conflicting views, even if the court "would justifiably have made a different choice had the matter been before it *de novo*."  *Id.* at 488.  *Accord UFCW, Local 204 v. NLRB*, 506 F.3d 1078, 1080 (D.C. Cir. 2007).  "Indeed, the Board is to be reversed only when the record is so compelling that no reasonable fact finder could fail to find to the contrary."  *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011).  Furthermore, this Court will accept all credibility determinations made by the judge and adopted by the Board unless those determinations are "hopelessly

19

incredible, self-contradictory, or patently unsupportable." *Monmouth Care Ctr. v.*

*NLRB*, 672 F.3d 1085, 1092 (D.C. Cir. 2012) (quotation omitted).

## ARGUMENT

I.  **SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT THE HOSPITAL VIOLATED SECTION 8(a)(5) AND (1) OF THE ACT BY FAILING TO PROVIDE THE UNION WITH RELEVANT INFORMATION REQUESTED TO EVALUATE THE HOSPITAL'S HEALTHCARE PROPOSAL**

A.  **Applicable Principles Regarding the Duty to Provide Requested Information**

Section 8(a)(5) of the Act (29 U.S.C. § 158(a)(5)) makes it an unfair labor

practice for an employer to refuse to bargain collectively with the representative of

its employees.  It is well settled that an employer's duty to bargain includes the

duty, in good-faith, "to provide information that is needed by the bargaining

representative for the proper performance of its duties."  *NLRB v. Acme Indus. Co.*,

385 U.S. 432, 435-37 (1967).  Therefore, an employer's duty to bargain in good

faith includes the duty "to supply a union with 'requested information that will

enable [the union] to negotiate effectively.'"  *N.Y. & Presbyterian Hosp. v. NLRB*,

649 F.3d 723, 729 (D.C. Cir. 2011) (quoting *Oil, Chem. & Atomic Workers Local*

*Union No. 6–418 v. NLRB*, 711 F.2d 348, 358 (D.C. Cir. 1983) (alteration in

original)).  Accordingly, an employer's failure to provide relevant information

upon request constitutes a violation of Section 8(a)(5) and (1) of the Act.  *Acme*, 385 U.S. at 435-36.[5]

In order to facilitate the exchange of relevant information, certain categories of information are viewed as "presumptively relevant" to the union's duty to represent the unit employees.  *See Country Ford Trucks, Inc. v. NLRB*, 229 F.3d 1184, 1192 (D.C. Cir. 2000).  As this Court has explained, "[i]nformation related to the wages, benefits, hours, [and] working conditions . . . of represented employees is presumptively relevant."  *Id.* at 1191.  Such information enjoys a presumption of relevance because it is "central to the core of the employer-employee relationship."  *Oil, Chem. & Atomic Workers*, 711 F.2d 348 at 359 (internal citation omitted).  Furthermore, as this Court has recognized, the duty to provide information relevant to the issues on the bargaining table is a "fundamental obligation" that is critical to the collective-bargaining process.  *Id.* at 358.

When requesting information that is not presumptively relevant, for example, "information about employees outside the bargaining unit, the union must explain to the employer why the information is relevant."  *N.Y. &*

---

[5] Section 8(a)(1) of the Act (29 U.S.C. § 158(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [S]ection 7" of the Act.  A violation of Section 8(a)(5) of the Act therefore results in a "derivative" violation of Section 8(a)(1).  *See Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983).  *Accord Exxon Chem. Co. v. NLRB*, 386 F.3d 1160, 1164 (D.C. Cir. 2004).

*Presbyterian*, 649 F.3d at 730.  The Court applies a "discovery-type standard,"

*Acme,* 385 U.S. at 437, under which "'[t]he fact that the information is of probable

or potential relevance is sufficient to give rise to an obligation . . . to provide it.'"

*N.Y. & Presbyterian*, 649 F.3d at 730 (quoting *Oil, Chem. & Atomic Workers*, 711

F.2d at 359 (ellipsis in original)).  *See also Detroit Newspaper Printing & Graphic*

*Communications Union v. NLRB*, 598 F.2d 267, 271 (D.C. Cir. 1979) (information

is relevant if it is germane and "has any bearing" on the subject matter of the case).

The Board's judgment on the question of relevance is entitled to "great

deference," because "[d]etermining whether a party has violated its duty to 'confer

in good faith' is particularly within the expertise of the Board."  *Crowley Marine*

*Servs. v. NLRB*, 234 F.3d 1295, 1297 (D.C. Cir. 2000) (citation omitted).  *Accord*

*Detroit Newspaper*, 598 F.2d at 272.

> **B.    The Board Reasonably Determined Based on Substantial Evidence that the Hospital Violated Section 8(a)(5) and (1) of the Act by Failing To Provide the Requested Information Because the Information Is Relevant to the Bargaining Process**

The Hospital "never produced any information responsive to the Union's

July 23 information request."  (D&O 18.)  The Board reasonably found (D&O 2,

18) that the information requested on July 23 is relevant to the parties' collective-

bargaining negotiations and, thus, the Hospital had an obligation to furnish that

information to the Union.

22

For the bulk of the information requested, the Board determined that it was presumptively relevant "to understand the ramifications of the employer's healthcare proposal—information concerning wages, hours, and terms and conditions of employment." (D&O 18.) *See Country Ford*, 229 F.3d at 1191 ("[i]nformation related to the . . . benefits. . . of represented employees is presumptively relevant"); *Honda of Hayward*, 314 NLRB 443, 444 (1994) (finding description of healthcare plan presumptively relevant); *Aztec Bus Lines, Inc.*, 289 NLRB 1021, 1037 (1988) (finding carrier of health benefit plan was relevant because carrier's identity would enable union to investigate financial condition and reputation of carrier). The Board reasonably found that all of the requested information "pertaining to pressure ulcers, rates of septicemia, or other rates of hospital-acquired infection" is presumptively relevant as it relates to the care that employees would receive under the Hospital's EPO plan and is thus related to a term and condition of their employment. (D&O 2.)

As for the remaining information that was not presumptively relevant, the Board found that the Union established its relevance in its August 17 letter to the Hospital responding to the Hospital's relevance objections to certain items. This Court has held that "context is everything in evaluating the relevance of a union's request for information and we consider the reasons proffered by the union at the time of its request." *N.Y. & Presbyterian*, 649 F.3d at 350 (finding relevance

where union requested information about nurse practitioners working for any

employer at hospital to investigate grievance over hospital itself hiring non-union

nurse practitioners).  As the Board found (D&O 19), monetary constraints, in the

form of having to obtain a referral from a primary care physician to go outside the

Prime network for healthcare and the geographic dispersion of Prime hospitals,

"push employees or at least strongly encourage them to use the Prime network

under the EPO plan . . . [therefore,] the aforementioned requested information is

relevant for the Union to assess the new benefit plan that includes a new and

different network of doctors and facilities" its members have not previously

utilized.

The Board also found (D&O 19) that "information regarding the training

given to employees surrounding proper cleaning of surfaces or training regarding

prevention and treatment of a type of ulcer often contracted during hospital stays or

a list of all nurse practitioners and physician assistants serving in the hospital is . . .

relevant for the Union to properly evaluate" the proposed EPO program.  *See, e.g.*,

*Acme*, 385 U.S. at 438 n. 8 (noting that to deny a union information relating to

bargaining proposals is to "'require[e] it to play a game of blind man's bluff'"

(citation omitted)).  As to information relating to the Program for Evaluating

Payment Patterns Electronic Report ("PEPPER"), the Board reasonably found that,

even assuming the information is not presumptively relevant, the Union "easily

24

establishe[d]" relevance in its August 17 letter.  (D&O 2, 19.)  In that letter, the

Union provided a "detailed" response to the Hospital's relevance objections by

giving the "rationale and basis for how each piece of requested information would

enable the Union to properly evaluate" the Hospital's healthcare proposal.  (D&O

19; GCX 37.)  *See, e.g.*, *New Surfside Nursing Home*, 330 NLRB 1146, 1146 n.1

(2000) (finding request for submissions to government agencies such as Medicare

relevant to union's evaluation of economic proposals).  Indeed, as the Board

observed (D&O 19), the Union carried its "minimal burden" of establishing

relevance by "detail[ing] item by item how the requested information would enable

the Union to better understand and evaluate" the Hospital's healthcare proposal.

*See N.Y. & Presbyterian*, 649 F.3d at 729-30.

### C.    The Hospital's Objections to the Board's Relevance Findings are Insufficient to Overcome the Union's Minimal Burden

The Hospital states that the standard for whether an employer violates the

Act for withholding relevant information is whether the employer's actions

"frustrate[] effective collective bargaining."  (Br. 40.)  The Hospital provides no

authority in support of this proposition, and as discussed above, an employer's

duty to bargain in good faith includes a duty to provide relevant, requested

information relating to its bargaining proposals.  *See Acme*, 385 U.S. at 438 & n.8;

*Crowley Marine*, 234 F.3d at 1297 ("probable or potential relevance is sufficient to

give rise to an obligation" to provide requested information).

In simply stating that the "requested information was not presumptively relevant," (Br. 42), the Hospital counters the Board's finding to the contrary with a bare assertion.  This is not enough to overcome this Court's deference to the Board's findings.  *See Wayneview*, 664 F.3d at 348.  Moreover, the Board's finding of presumptive relevance is supported by this Court's precedent holding that information relating to terms and conditions of employment for unit employees— including benefits—is presumptively relevant.  *See Country Ford*, 229 F.3d at 1191.  Finally, this Court has held that when the union's request is for presumptively relevant information, the employer must timely provide that information unless it can show that the information is irrelevant, which again requires more than a mere assertion.  *See N.Y. & Presbyterian*, 649 F.3d at 730.

While the Hospital correctly states (Br. 43) that the Board, with respect to information that is not presumptively relevant, will assess a union's proffered reasons for relevance, the Hospital ignores that the Board made such an assessment here and found the Union met its burden.  To that end, the Hospital's reliance (Br. 43-44) on *Columbus Products Company*, 259 NLRB 220 (1981), does not negate the Board's analysis here.  In *Columbus Products*, a judge determined that an employer did not have to disclose names of employees whom the employer was not going to call as witnesses in a grievance and arbitration proceeding where the employer provided the union with the substance of those employees' statements

26

about the incident being grieved. *Id.* at 223-24. In upholding the judge's dismissal of the complaint, the Board recited a principle that is fully in line with the Board's findings in this case—that the Board must determine whether requested information is relevant and significant to the union's performance of its duties as collective-bargaining representative. Here, as described above, the Board found (D&O 2, 19), based on substantial evidence in the record, that the Union's July 23 information request was relevant, and in large measure presumptively relevant, to evaluating a new benefit plan that included a new and different network of doctors than the employees had been previously required to use.

### D.     The Board Properly Rejected the Hospital's Assertion that the Union's Information Request Was Made in Bad Faith

As it did before the judge and the Board, the Hospital contends (Br. 18-19, 44-46) that the Union's July 23 information request was made in bad faith because, according to the Hospital, the Union wanted the information to wage a corporate campaign against Prime and stall negotiations. The Board reasonably rejected this assertion as unsupported by the record and found that the Union's request was "not made in bad faith or with an improper motive." (D&O 19.) *See N.Y. & Presbyterian*, 649 F.3d at 732 (burden on employer to offer evidence showing union acting with purpose other than carrying out its collective-bargaining duties). In any event, the "proper venue for [the Hospital] to raise its allegations about the national campaign by [the Union] would be through unfair labor charges against

the union itself," rather than by engaging in bad-faith bargaining.  *Cintas Corp. v. NLRB*, 589 F.3d 905, 913-14 (8th Cir. 2009) (finding exhibits and testimony concerning union's conduct in national campaign inadmissible where employer contended union's campaign designed to force employer into an unfavorable neutrality and card check agreement).

The Hospital's continued reliance (Br. 44, 52) on *Graphic Communications Workers v. NLRB*, 977 F.2d 1168, 1169-70 (7th Cir. 1992), is, as the judge explained (D&O 19), misplaced.  While acknowledging that information requests can have a harassing purpose, the judge found that the Hospital did not carry its burden of demonstrating that the Union acted with any bad faith purpose as proscribed by the *Graphic Communications* Court—despite the fact that the Hospital's arguments "directly mimic" examples in that case of potentially harassing information requests.[6]  (D&O 19.)  *See id.* at 1170 (affirming Board determination that employer did not have to provide requested financial records to substantiate claims that it would lose business if wage concessions not given because employer did not assert inability to pay).

---

[6] As the Seventh Circuit explained, and the judge discussed (D&O 19), "a request designed to harass—has a tripartite structure." *Graphic Communications*, 977 F.2d at 1170.  A union may want information because it is embarrassing and therefore could make way for bargaining concessions.  A union may want an opportunity to take protected action such as a strike in response to an employer's denial of its request.  A union may want to delay "the evil day" on which the employer will take unilateral action on its bargaining demands.  *Id.* at 1170.

The Hospital's argument relies (Br. 45) in part on its assertion that the July 23 request was an "attempt to obtain the same type of information" as a prior union information request in November 2009.  However, as the Board found (D&O 20), the July 23 request was "materially broader" because it requested information about all Prime hospitals to evaluate the Hospital's benefits proposal, whereas the November 2009 request was primarily directed at the Centinela facility because of workplace safety and staffing level concerns.[7]  By the time the Union made its broader request on July 23, the Hospital had proposed its new EPO plan, including the new gatekeeper requirement that employees would have to see a Prime primary care physician first in all instances, and the Union had expressed concerns about the Prime's healthcare network including the quality of care at Prime hospitals. (D&O 20.)  The Hospital had not yet, however, unilaterally announced or implemented the EPO plan nor had it made its alleged last, best, and final offer that included the EPO plan with gatekeeper requirement.  (D&O 20.)  Therefore, as the Board explained (D&O 20), the parties were "in the thick of negotiations" and "actively bargaining" such that the Union needed information to assess and respond to the Hospital's "push for the drastic revision in healthcare as presented by the new restrictive EPO option."   Simply put, the July 23 request was "not a

---

[7] The Hospital declined to provide information in response to the November 2009 request.  (D&O 20.)

'do-over' of the November 2009 request" (D&O 20) and the record, including the

chronology of events, does not in any way support the Hospital's assertion that the

Union did not act in good faith when submitting its July 23 letter.

Furthermore, the Hospital's belief (Br. 14) that the quality of care

information should have been requested in February 2010, when the Hospital first

made its EPO proposal, does nothing to undermine the relevance of that

information to the Union's evaluation of later EPO proposals.  In making this

argument, the Hospital relies (Br. 10-11, 15) on discredited testimony and

bargaining notes of Mary Schottmiller.  (D&O 9.)  For example, the Hospital states

(Br. 11, 15) that the Union was told on February 16, 2010, that employees would

have to utilize a Prime primary care physician to go to a specialist in or out of

network.  However, the judge found based on credited evidence that the Union was

not aware of this requirement until after the May 6 bargaining session.  (D&O 10,

17; GCX 29, Tr. 117-18.)

The Hospital continues its misplaced reliance (Br. 17, 45, 53) on the fact that

the Union had already agreed to the EPO plan at two other Prime hospitals in

Garden Grove and Encino.  But the Board reasonably determined that the "mere

fact that the Union represents employees at other Prime hospitals does not mean

that . . . employees at Centinela do not have the right to necessary and relevant

information regarding the [Hospital's] healthcare proposal that would allow them

to be informed consumers and make informed decisions during bargaining."[8]
(D&O 21.)  While the Union may negotiate agreements at various Prime hospitals,
the negotiations at issue in this case are, as the Board indicated (D&O 21),
"distinct and separate from any earlier or future" negotiations at other Prime
hospitals.[9]

---

[8] The Hospital contends (Br. 23) that it believed quality-of-care concerns with the
Prime network should have come from employees rather than the Union.  The
Hospital ignores the fact that the Union, through its request for information, was
acting as the employees' collective-bargaining representative and raising such
concerns on behalf of employees.

[9] The Hospital has waived its argument that the Union's information request
included confidential information by not raising it in its brief to this Court.  *See
Fox v. Gov't of D.C.*, 794 F.3d 25, 29 (D.C. Cir. 2015) (argument not raised in an
opening brief is forfeited).  The Hospital states (Br. 39) that the judge based his
decision on a conclusion that the information requested was "not confidential" but
offers no assertion or argument as to the judge or the Board erring in this regard.
In any event, the Board reasonably found (D&O 2) that the Hospital failed to prove
that any of the requested information is confidential.  *See U.S. Testing Co. v.
NLRB*, 160 F.3d 14, 20 (D.C. Cir. 1998) ("[a]n employer is not relieved of its
obligation to turn over relevant information simply by invoking concerns about
confidentiality, but must offer to accommodate both its concern and its bargaining
obligations").  Nevertheless, the Board did not reject the Hospital's confidentiality
claims out of hand.  Because the Hospital raised issues of patient privacy, the
Board ordered it to comply with the Union's information request "to the fullest
extent allowed by law."  (D&O 5.)  Further, the Board's Order does "not preclude
[the Hospital] from raising patient confidentiality arguments during the compliance
stage of this proceeding."  (D&O 2.)

## II.    THE BOARD IS ENTITLED TO SUMMARY ENFORCEMENT OF ITS UNCONTESTED FINDING THAT THE HOSPITAL VIOLATED SECTION 8(a)(5) AND (1) OF THE ACT BY UNILATERALLY ANNOUNCING IT WOULD BE IMPLEMENTING NEW HEALTHCARE PLANS

In its opening brief, the Hospital does not contest the Board's finding that it violated Section 8(a)(5) and (1) of the Act on September 1, 2010, when it unilaterally announced to its employees that new healthcare plans would take effect in January 2011 and employees would need to choose a new plan during an open enrollment period beginning on November 1.  (D&O 3 n.9.)  Under well-settled law, the Hospital's failure to contest this finding constitutes a waiver of any defense and warrants summary enforcement of the Board's Order with respect to this violation.  *Carpenters & Millwrights, Local Union 2471 v. NLRB*, 481 F.3d 804, 808 (D.C. Cir. 2007) ("it is [this Court's] longstanding rule that '[t]he Board is entitled to summary enforcement of the uncontested portions of its order[s]'") (quoting *Flying Food Group, Inc. v. NLRB*, 471 F.3d 178, 181 (D.C. Cir. 2006)).  *Accord Fallbrook Hosp. Corp. v. NLRB*, 785 F.3d 729, 736 (D.C. Cir. 2015).

### III. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT THE HOSPITAL VIOLATED SECTION 8(a)(5) AND (1) OF THE ACT BY UNILATERALLY IMPLEMENTING ITS HEALTHCARE PROPOSAL WITHOUT BARGAINING TO IMPASSE

It is undisputed that the Hospital unilaterally implemented its EPO plan on January 1, 2011, without bargaining with the Union. Absent a good-faith impasse, which the Board reasonably found was not reached here, the Hospital's action violated Section 8(a)(5) and (1) of the Act because an employer is not privileged to unilaterally change employees' terms and conditions of employment when bargaining has not reached impasse.[10] *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991) (citing *NLRB v. Katz*, 369 U.S. 736 (1962)). Such changes "injure[] the process of collective bargaining itself . . . by emphasizing to the employees that there is no necessity for a collective bargaining agent." *Honeywell Int'l, Inc. v. NLRB*, 253 F.3d 125, 131 (D.C. Cir. 2001) (internal quotations omitted).

Here, the Board soundly rejected the Hospital's defensive claim that the parties were at a good-faith impasse on two independent bases, either of which is sufficient to show the Hospital's claim must fail. First, the Board relied, under

---

[10] An employer commits an unfair labor practice in violation of Section 8(a)(5) by "refus[ing] to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). As noted previously, an employer that violates Section 8(a)(5) also derivatively violates Section 8(a)(1). *Exxon Chem. Co. v. NLRB*, 386 F.3d 1160, 1164 (D.C. Cir. 2004).

well-settled law, on the existence of the Hospital's unremedied unfair labor

practices—its failure to provide relevant information and its unilateral

announcement of the EPO plan to employees—as precluding a finding of good-

faith impasse.  Second, the Board determined, based on substantial record evidence

and settled law, that, even apart from those unremedied unfair labor practices, the

totality of circumstances failed to show that the parties had, in fact, reached

impasse prior to the Hospital's implementation on January 1, 2011.  When upheld

by this Court, either analysis independently shows there can be no finding of a

valid impasse that would privilege the Hospital's unilateral healthcare changes.

### A.  The Board Reasonably Found that the Hospital's Unlawful Conduct During Bargaining Precludes a Finding of Impasse

#### 1.  Applicable principles of unremedied unfair labor practices precluding impasse

This Court has recognized that unremedied unfair labor practices can

contribute to the parties' inability to reach an agreement.  *Alwin Mfg. Co. v. NLRB*,

192 F.3d 133, 139 (D.C. Cir. 1999).  As this Court stated, "[t]here are at least two

ways in which an unremedied [unfair labor practice] can contribute to the parties'

inability to reach an agreement."  *Id*.  First, an unfair labor practice can "increase

friction at the bargaining table."  *Id.*  Furthermore, by altering the status quo, such

as by announcing a change in terms and conditions of employment that has not been

bargained for, an employer's unilateral action "may move the baseline for

negotiations and alter the parties' expectations about what they can achieve,

making it harder for the parties to come to an agreement." *Id.*

Moreover, certain unremedied unfair labor practices can alone create a

barrier to a good-faith impasse.  Specifically, the Board has long recognized that a

lawful impasse "cannot exist where the employer has failed to satisfy its statutory

obligation to provide information needed by the bargaining agent to engage in

meaningful negotiations." *Decker Coal Co.*, 301 NLRB 729, 740 (1991).  This

Court has likewise found that a failure to provide necessary information in

bargaining "frustrate[s] the parties' efforts to reach an agreement and preclude[s] a

finding of genuine impasse." *Monmouth Care Ctr. v. NLRB*, 672 F.3d 1085, 1093

(D.C. Cir. 2012).  *Accord E.I. Du Pont de Nemours & Co. v. NLRB*, 489 F.3d

1310, 1315 (D.C. Cir. 2007) (citing *U.S. Testing Co., Inc. v. NLRB*, 160 F.3d 14,

20, 22 (D.C. Cir. 1998)); *Raven Servs. Corp. v. NLRB*, 315 F.3d 499, 505 (5th Cir.

2002); *Olivetti Office U.S.A., Inc. v. NLRB*, 926 F.2d 181, 188-89 (2d Cir. 1991);

*Cone Mills Corp. v. NLRB*, 413 F.2d 445, 449-50 (4th Cir. 1969).

When considering whether a past violation exerts a continuing effect that

taints later negotiations, "[i]t may not always be easy to differentiate between an

unremedied [unfair labor practice] that contributes to a deadlock and one that does

not." *Alwin Mfg*, 192 F.3d at 139.  Thus, the analysis "is a quintessential question

of fact which is appropriately left to the Board to resolve in each case in light of its

expertise." *Id.* (citing *Am. Fed'n of Television & Radio Artists v. NLRB*, 395 F.2d 622, 627 (D.C. Cir. 1968)).

>    **2.    The Board correctly found that the Hospital's uncontested unilateral announcement of its EPO plan to employees and its failure to provide relevant information precludes a finding of impasse**

The Hospital committed two unfair labor practices which, applying the above applicable principles, so disrupted the parties' bargaining relationship as to prevent the possibility of a good-faith impasse from even arising.   First, a lawful impasse cannot exist in the face of the Hospital's unremedied failure to provide requested information relevant to its healthcare proposal.   Additionally, the Hospital does not even contest the second of these violations: its unilateral announcement of EPO plan implementation.

>    **i.    The Hospital's failure to provide requested information precludes a finding of impasse**

The Board reasonably found that the Hospital's "failure to provide the Union with the information it requested on July 23 precludes a finding that the parties were at impasse on January 1, 2011." (D&O 2-3.)  As the Board stated, as a result of the Hospital's failure to provide the requested information, "it is unknown as to whether the Union and the [Hospital] would have bargained to impasse or reached an agreement regarding healthcare because the Union was never furnished the relevant and necessary information to evaluate key components" of the EPO plan.

(D&O 23.)  *See, e.g.*, *E.I. Du Pont*, 489 F.3d at 1315 (failure to provide data

underlying cost-savings calculations precluded impasse on subcontracting).

The Board specifically found that the Union's information request "related

to the core issue of the quality of care of [the Hospital's] proposed new healthcare

plan that separate[d] the parties."  (D&O 23.)  As this Court has recognized,

"Board and court precedents reflect the principle that a denial of 'information

relevant to the core issues separating the parties' can preclude a lawful impasse,

and such a commonsense principle is certainly reasonable."  *Id.* at 1316.  The

Board thus reasonably found that due to the Hospital's failure to provide the

information the Union needed to evaluate the Hospital's proposal on the core issue

of healthcare, "impasse was not reached."  (D&O 23.)

The reasonableness of the Board's approach here is further illustrated by this

Court's decision in *United States Testing*.  In that case, the employer, citing rising

healthcare costs, sought to increase the healthcare contributions made by unit

employees.  The union requested claims information for all employees, even those

outside the unit, to evaluate the employer's claim and formulate a response.  160

F.3d at 20.  The employer did not supply that information—although it provided

summaries as well as other related information—and declared an impasse.  *Id.*

This Court, after reviewing the Board's relevance findings, concluded that the

impasse was unlawful stating that "this court can quickly dispose of the

[employer's] other contentions . . . [i]ts unlawful refusal to supply the requested medical claims information precluded the [employer] from declaring an impasse." *Id.* at 22. As in that case, the Hospital's failure here to provide information relevant to quality of care under its healthcare proposal precludes a finding that the Hospital lawfully declared impasse.

The Hospital argues (Br. 53) that the record lacks evidence "to support the inference that the Union may have agreed to the EPO plan" if the Hospital had provided the information on quality of care. The Hospital fails to cite any precedent showing an employer's refusal to provide relevant information does not preclude impasse if the information requested would not have caused the union to capitulate to the employer's demands. The standard, as cited above, is that an unremedied failure to provide relevant information related to a bargaining proposal precludes a good-faith bargaining impasse. *E.I. Du Pont*, 489 F.3d at 1315; *U.S. Testing*, 160 F.3d at 22. There is no additional requirement that the quality of care information would have led the Union to agree to the Hospital's terms.

## ii. The Hospital's unilateral announcement tainted further negotiations

As shown in Argument Section II., the Board is entitled to summary enforcement of its uncontested finding that the Hospital violated Section 8(a)(5) and (1) of the Act on September 1, 2010, when it unilaterally announced to its employees that new healthcare plans, including the EPO plan, would take effect on

January 1, 2011. (*See* p. 30, above.) As the Board indicated, "even before the [Hospital] declared impasse in October 2011," it had already sent a memorandum to employees "detail[ed] the process that employees would need to follow . . . well in advance of the January implementation date" thereby going "beyond simply stating a planned change" and "indicat[ing] that action was required of employees." (D&O 3 n.9, 27; *see* GCX 42A.)

    In its announcement, the Hospital omitted any reference to ongoing negotiations instead "present[ing] the healthcare changes as a fait accompli . . . signal[ing] to employees that the [Hospital] no longer intended to deal with the Union over healthcare." (D&O 3 n.9.) Therefore, when the Hospital told employees that they would soon be signing up for the new EPO plan, "damage to the bargaining relationship had been accomplished simply by th[at] message." (D&O 27.) The employees now knew that the Hospital was "taking it on itself to set this important term and condition of employment, thereby 'emphasizing to the employees that there is no necessity for a collective bargaining agent.'" *ABC Auto. Products Corp.*, 307 NLRB 248, 250 (1992) (quoting *May Dep't Stores Co. v. NLRB*, 326 U.S. 376, 385 (1945)). This uncontested unilateral action thus caused both friction in the parties' bargaining relationship and moved the parties' expectations in such a way as to make an agreement harder to achieve. For both of those reasons, the announcement of the EPO plan is an unremedied unfair labor

practice that supports the Board's finding that no lawful impasse could have arisen.

*See Alwin Mfg.*, 192 F.3d at 139.

### B.  The Board Reasonably Found that the Totality of Circumstances Precludes a Finding of Lawful Impasse

As shown, the Hospital's unremedied unfair labor practices as a matter of law preclude a good-faith impasse from having arisen in this case.  However, the Board further found (D&O 3, 24), even assuming arguendo that those unlawful actions did not prevent an impasse, the totality of the circumstances demonstrate that the parties did not reach impasse prior to the Hospital's unilateral implementation of its healthcare proposal.

### 1.  Applicable principles of bargaining to impasse

"The Board does not lightly find an impasse," *Powell Elec. Mfg. Co.*, 287 NLRB 969, 973 (1987), *enforced*, 906 F.2d 1007 (5th Cir. 1990), because unilateral implementation of new terms goes against the policies of fostering stable bargaining relationships and effectuating employee choice of representative that are at the center of the Act.  *Honeywell Int'l*, 253 F.3d at 131.  As this Court has stated, impasse is defined as the deadlock reached by bargaining parties "after good-faith negotiations have exhausted the prospects of concluding an agreement," and there is no realistic prospect that continuing the discussion will be productive. *See Teamsters Local Union No. 175 v. NLRB*, 788 F.2d 27, 30 (D.C. Cir. 1986) (citations omitted).  Impasse exists only when "good-faith negotiations have

exhausted the prospects of concluding an agreement and there is no realistic possibility that continuation of discussion would be fruitful." *Monmouth Care Ctr. v. NLRB*, 672 F.3d 1085, 1088 (D.C. Cir. 2012) (citations omitted). The party asserting impasse bears the burden of proving it. *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 347 (D.C. Cir. 2012).

The Board, with this Court's approval, considers a number of factors in determining whether impasse exists. These factors include "'bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, and the contemporaneous understanding of the parties as to the state of negotiations.'" *Teamsters Local Union No. 639 v. NLRB*, 924 F.2d 1078, 1083 (D.C. Cir. 1991) (quoting *Taft Broad. Co.*, 163 NLRB 475, 478 (1967), *petition for review denied sub nom. Am. Fed'n of Television & Radio Artists v. NLRB*, 395 F.2d 622 (D.C. Cir. 1968)). The Board concludes impasse has been reached when "there is no realistic possibility that continuation of discussion at the time would have been fruitful." *Am. Fed'n of Television & Radio Artists*, 395 F.2d at 628. In sum, the evidence must show that both parties believed that they were at the end of their bargaining rope. *See Teamsters Local 639*, 924 F.2d at 1084. In addition, "continuous negotiating progress is strong evidence against an impasse." *Teamsters Local 175*, 788 F.2d at 31.

Because the existence of impasse is a question of fact, this Court "'ordinarily defers to the Board's fact-finding as to the existence of a bargaining impasse.'" *Monmouth*, 672 F.3d at 1089 (quoting *Wayneview*, 664 F.3d at 348). Indeed, "in the whole complex of industrial relations, few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of [the Board,] which deals constantly with such problems." *Wayneview*, 664 F.3d at 348 (quotation omitted). *Accord Dallas Gen. Drivers v. NLRB*, 355 F.2d 842, 844-45 (D.C. Cir. 1966).

### 2. The Board reasonably found that the totality of circumstances fails to show the parties reached impasse before the Hospital implemented its EPO plan

Even putting aside the fact that the Hospital's unremedied unlawful conduct prior to its October 21 declaration of impasse prevented a good-faith impasse from arising, the Board found there was no actual impasse in bargaining itself. The Board's conclusion is based on three findings. First, the parties had not reached impasse on the critical issue of healthcare. Next, even if the parties were at impasse on the single issue of healthcare, that failure to reach agreement did not lead to a breakdown in overall bargaining. Finally, to the extent there was a breakdown, the Hospital's independently unlawful conduct of conditioning continued bargaining on the Union's acceptance of the Hospital last, best, and final offer, demonstrates bad faith in bargaining. Significantly, again, the Hospital does

not even contest that the third finding constituted an independent unfair labor practice.

### i. Substantial evidence supports the Board's finding that the Hospital failed to establish that impasse was reached on the critical issue of healthcare

As the Board noted (D&O 3, 28), a party contending that overall impasse has been reached because of a deadlock in negotiations over a single issue must demonstrate that the issue is a critical issue, and that the impasse on this critical issue led to an overall breakdown in negotiations—"in short, that there can be no progress on any aspect of the negotiations until the impasse relating to the critical issue is resolved." *Calmat Co.*, 331 NLRB 1084, 1097 (2000).

First, the Hospital describes (Br. 23, 26, 27, 33) healthcare as a "critical" or "single critical" issue in bargaining. It did the same in communications during bargaining and in correspondence with the Union. (D&O 28; GCX 23.) However, as the Board stated (D&O 28), "using the correct lingo does not relieve the [Hospital] of liability when the legal test cannot be met." The Board found (D&O 3) that "even if the evidence was sufficient" to support a finding of impasse on healthcare, the Hospital "failed to show" that such an impasse "led to an overall breakdown in bargaining" as it would have if healthcare were a single critical issue in the parties' bargaining.

43

Second, the Board reasonably found (D&O 3) that the Hospital "failed to show an actual impasse over healthcare." Even at the October 21 session where the Hospital began by declaring impasse—both as to healthcare and overall—it later presented the Union with a healthcare proposal significantly changing the structure of the PPO plan. (D&O 3-4; GCX 48.) Following that session, the Union requested information about doctors in the Prime network and the Hospital provided that information. (D&O 25; RX 117.) As the Board found (D&O 4), there was no doubt that "negotiations were still progressing, including with respect to the 'critical issue' of healthcare."

### ii.    The Board reasonably found that the Hospital failed to demonstrate an overall breakdown in bargaining

Furthermore, even assuming the evidence was sufficient to show the parties reached impasse on a single critical issue, the Hospital failed to show that any impasse on healthcare led to a breakdown in overall bargaining. *Calmat*, 331 NLRB at 1097. In finding that the Hospital did not meet its burden, the Board relied on parties' continued negotiations after the Hospital declared impasse including reaching agreement on certain provisions and the Hospital making changes to its proposals as well as the lack of a contemporaneous understanding that the parties were at impasse. *See Teamsters Local 639*, 924 F.2d at 1083.

The Board relied (D&O 3) "most significantly" on evidence showing that, even after the Hospital declared impasse, the parties "continued to negotiate and to

reach agreement on substantive provisions of the collective-bargaining agreement."
On the same day that the Hospital declared impasse, it made meaningful changes
to its centrally important healthcare proposal.  (D&O 3, 25; GCX 48.)  Also,
following the Hospital's declaration of impasse that day, the parties reached
agreement on two substantive collective-bargaining provisions on management
rights and subcontracting.  (D&O 4.)  *See Atl. Queens Bus Corp.*, 362 NLRB No.
65, slip op. at 3 (2015) (citing late movement on key issues, including day
employer declared impasse, as evidence that parties had not reached impasse).

Additionally, as the Board found, "[a]t no time after declaring impasse did
the [Hospital's] proposals remain static."  (D&O 3.)  In December, two months
after declaring impasse, the Hospital presented the Union with a "last, best and
final offer" that changed the dates of proposed employee pay raises.  (D&O 3;
GCX 52.)  As the Board found (D&O 4), this was "yet another substantive change
from the [Hospital's] asserted final proposal, again showing that there was room
for movement."   Indeed, throughout 2011, the parties continued to meet "all the
while the [Hospital] was asserting impasse and the Union was offering and making
proposals."  (D&O 25; GCX 65-70.)  *See Teamsters Local 175*, 788 F.2d at 31
("continuous negotiating progress is strong evidence against an impasse").  The
Board found (D&O 3) that such evidence persuasively demonstrated that the
Hospital was "not warranted in assuming that further bargaining would be futile."

Indeed, the Hospital's actions would have made no sense if either of the parties believed they had already "'exhausted the prospects of concluding an agreement.'" *Monmouth*, 672 F.3d at 1088 (quoting *Taft Broad.*, 163 NLRB at 478).

Further, substantial evidence supports the Board's finding (D&O 3) that there was "no contemporaneous understanding" by the parties that they were at impasse.  There was simply "no clear point where *both* parties in this case believed negotiations were at impasse."[11]  (D&O 25 (emphasis in original).)  *See Monmouth*, 672 F.3d at 1090 (finding no lawful impasse where record contained no "evidence of any contemporaneous understanding that the parties were at genuine impasse"); *cf. Chicago Local No. 458-3M, Graphic Comm'ns Int'l Union v. NLRB*, 206 F.3d 22, 34 (D.C. Cir. 2000) (finding impasse where employer's attorney "stated that he believed the parties were at an impasse" and the union "did not disagree").

The Board determined that the Union "not only thought there was more to bargain over concerning the proposed EPO plan, as well as other topics but also continually requested the quality of care information and asked to engage in

---

[11] The Board further noted (D&O 3) that the 15 bargaining sessions between December 2009 and March 2011 were not so numerous to show that the parties "reached 'the end of their rope,' especially in light of the number of contract proposals" and the dedication of some sessions to noneconomic issues.  *See, e.g.*, *Beverly Farm Foundation v. NLRB*, 144 F.3d 1048, 1052-53 (7th Cir. 1998) (finding 19 bargaining sessions over more than 1 year insufficient to show impasse where multiple sessions were dedicated to noneconomic issues).

bargaining." (D&O 25.) The Union continued to meet and correspond with the

Hospital. For example, on October 29, the Union responded to a Hospital assertion

of impasse by stating that the Union "did not believe it was at impasse and that it

was still waiting for information requested regarding the [EPO] proposal" and

indicating that it was ready and willing to bargain. (D&O 15; GCX 50.)

Furthermore, on November 2, the Union requested information regarding doctors

in the Prime network under the EPO plan. (D&O 15; RX 117.) Thus, the Union

"not only continued to declare its intention to be flexible, but demonstrated this

throughout its dealings" with the Hospital. *Grinnell Fire Protection Syst. Co.*, 328

NLRB 585, 585 (1999). Because "[b]oth parties must believe that they are at the

end of their rope" for impasse to exist, the Union's belief that further negotiations

could be fruitful, and its conduct reflecting that belief, was enough to forestall a

finding of impasse. *PRC Recording Co.*, 280 NLRB 615, 635 (1986). *Accord Am.

Fed'n of Television & Radio Artists*, 395 F.2d at 628 (impasse not reached because

there was a "realistic possibility that continuation of discussion at the time would

have been fruitful").

### iii. The Hospital's uncontested unlawful conduct in bargaining further supports the Board's finding of no impasse

The parties' continuing negotiations culminated in a final bargaining session

on December 22, 2011. After that session, the Hospital conditioned further

bargaining on the Union's acceptance of the Hospital's last, best, and final offer. (D&O 16, 25; GCX 73-75.)  The Board found (D&O 5, 25) that by this conduct the Hospital violated Section 8(a)(5) and (1) of the Act by failing and refusing to bargain in good faith with the Union.  Because the Hospital has not contested this violation, the Board is entitled to summary enforcement of this uncontested finding.  *See Fallbrook Hosp. Corp. v. NLRB*, 785 F.3d 729, 736 (D.C. Cir. 2015). Furthermore, the Hospital's bad faith in bargaining as evidenced by this independently unlawful conduct weighs against a finding of impasse.  *See Teamsters Local 639*, 924 F.2d at 1082-84.

### iv.    The Hospital's additional arguments do not demonstrate that a good faith impasse was reached

The Hospital fails throughout its brief to address relevant, recent precedent from this Court on the question of whether a good-faith bargaining impasse exists. Even where it correctly states a point of law, the Hospital avoids citing actual impasse cases.  For example, the Hospital recites (Br. 47) that a bargaining impasse occurs when the parties are warranted in assuming that further bargaining would be futile.  In doing so, the Hospital cites *Comau, Inc. v. NLRB*, 671 F.3d 1232, 1237 n.10 (D.C. Cir. 2012).  But *Comau* was not a case where any party disputed that a good-faith impasse had occurred and thus the Court was not assessing, as it did, for example, in *Monmouth* and *Wayneview*, whether the

Board's determination that the parties were not at impasse was supported by

substantial evidence.[12]

The Hospital erroneously claims in an overly simplified manner that the law

provides that an impasse is reached where "the parties have declared their positions

and neither party will concede to the other."  (Br. 47.)  The Hospital fails to

mention that the case it cites for this proposition, which is itself an incomplete

statement of the law, differs considerably from the facts here.  *See Bloomsburg*

*Craftsmen*, 276 NLRB 400 (1985).  In that case, the Board found that the union "at

no time following the deadlock communicated any changes in either its proposal or

argumentation . . . [n]o attempt was made to counter the reasons offered by the

[e]mployer or to alter the stalemate by counterproposal."  *Id.* at 405.  In contrast, as

described above, the Union and the Hospital altered proposals and continued to

meet after the Hospital communicated a supposed "deadlock" on October 21, 2010.

The Hospital then states that the Board will "not hesitate" to find impasse

where a union "stalls negotiations" or "engages in tactics to forestall impasse."

(Br. 48.)  However, the Board rejected (D&O 27) the Hospital's assertion that the

---

[12] Similarly, the Hospital's misleading statement (Br. 31) about the "continuing
existence" of a bargaining impasse in 2011 ignores the Board's finding, supported
by substantial evidence, that no earlier impasse was reached in 2010.

Union engaged in bad-faith bargaining.[13]  For example, the Hospital's assertion

(Br. 26) that the Union's "purported acceptance" of the EPO plan on September 30

was "illusory" because the Union still wanted employees to access the Anthem

network without a referral does not demonstrate that the Union was acting in bad

faith.  The Union's acceptance of the fact that there would be an EPO option, even

if it did not accede to the Hospital's entire proposal, is, as the Board stated, "not so

illogical as to constitute bad faith bargaining."  (D&O 27.)

    The Hospital also asserts, without record support, that the Union "refus[ed]

to cooperate in [the Hospital]'s efforts to expand the Prime network of providers"

as a bad-faith bargaining tactic.  (Br. 51.)  To the contrary, the judge found that the

Hospital used a "sham" physician nomination form to lead its employees "to

believe that they could somehow add their personal primary care providers to the

Prime Network without any evidence that any physician was added through a

contractual relationship or proof that the physician would accept Prime's terms of

employment and compensation."  (D&O 17.)  This finding, based on evidence in

the record, demonstrates that it was the Hospital itself that failed to make a good-

faith effort to expand its network.

---

[13]  The Hospital's repeated attempts to retry the evidence before this Court wholly
disregards the standard of review in this case.  *See Universal Camera Corp. v.
NLRB*, 340 U.S. 474, 477 (1951).

50

Notwithstanding that the Board made no findings here that the Union engaged in "stalling" or other bad-faith "tactics," the Hospital relies (Br. 48) on distinguishable case law in support of its point. In *Matanuska Electrical Association*, 337 NLRB 680 (2002), the Board determined, unlike here, that an employer lawfully declared impasse where the union engaged in tactics such as taking the position that "all words are ambiguous" and insisting that the employer was obliged to explain its intent and motivation as to every proposal. *Id.* at 683. Furthermore, also unlike here, in *Matanuska*, the employer specifically stated that it was willing to continue bargaining if the union submitted a proposal showing some movement. *Id.* at 684.

The Hospital next asserts (Br. 48) that the Board considers "pressing business or operational needs" when determining whether impasse has been reached. However, the Hospital's only support for this assertion is a Board case that this Court reversed and remanded because, on the record before it, there was no legal justification for the employer's unilateral reduction in wages. *See Bell Transit Co.*, 271 NLRB 1272 (1985), *reversed sub. nom*, *Teamsters Local Union No. 175 v. NLRB*, 788 F.2d 27 (D.C. Cir. 1986).

Finally, the Hospital ignores (Br. 54) the Board's finding, which is entitled to deference, that "negotiations were still progressing" and "[a]t no time after declaring impasse did the [employer]'s proposals remain static."  (D&O 3, 4). This

contrasts with the Board's assessment of negotiations in *E. I. Du Pont De Nemours & Co.*, 268 NLRB 1075, 1076 (1984), a case on which the Hospital principally relies (Br. 47, 49, 54, 55).  In *Du Pont*, the Board determined that length of negotiations was "noteworthy" and that the parties "had exhausted the realistic possibility of reaching agreement."  *Id.*  Furthermore, in direct contrast to the Hospital's unremedied unfair labor practices here—one of which, the unilateral announcement of EPO plan implementation, is uncontested—the employer in *Du Pont* had "negotiated long, hard, and in good faith over job movement, and gave the [u]nion, in full, the bargaining opportunity to which it was entitled under the Act."  *Id.*  Accordingly, the Hospital has provided the Court with no basis to disturb the Board's finding.

# CONCLUSION

The Board respectfully requests that the Court enter a judgment denying the

Hospital's petition for review and enforcing the Board's Order in full.

s/Robert J. Englehart
ROBERT J. ENGLEHART
*Supervisory Attorney*

s/Amy H. Ginn
AMY H. GINN
*Attorney*
*National Labor Relations Board*
1015 Half Street SE
Washington, DC 20570
(202) 273-2978
(202) 273-2942

RICHARD F. GRIFFIN, JR
 *General Counsel*

JENNIFER ABRUZZO
 *Deputy General Counsel*

JOHN H. FERGUSON
 *Associate General Counsel*

LINDA DREEBEN
 *Deputy Associate General Counsel*

National Labor Relations Board

June 2016

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| PRIME HEALTHCARE CENTINELA, LLC | * |
| d/b/a CENTINELA HOSPITAL MEDICAL CENTER | * |
| | * Nos. 15-1436, |
| Petitioner/Cross-Respondent | * 16-1037 |
| | * |
| v. | * |
| | * Board Case No. |
| NATIONAL LABOR RELATIONS BOARD | * 31-CA-030055 |
| | * |
| Respondent/Cross-Petitioner | * |
| | * |
| and | * |
| | * |
| SEIU UNITED HEALTHCARE WORKERS-WEST | * |
| | * |
| Intervenor | * |

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the Board

certifies that its brief contains 11,980 words of proportionally-spaced, 14-point

type, the word processing system used was Microsoft Word 2010, and the PDF file

submitted to the Court has been scanned for viruses using Symantec Endpoint

Protection version 12.1.6 and is virus-free according to that program.


/s/ Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 17th day of June, 2016

# STATUTORY ADDENDUM

Relevant provisions of the National Labor Relations Act, as amended (29 U.S.C. §§ 151, et seq.):

Section 7 (29 U.S.C. § 157):

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3).

Section 8(a)(1) (29 U.S.C. § 158(a)(1)):

It shall be an unfair labor practice for an employer –
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7.

Section 8(a)(5) (29 U.S.C. § 158(a)(5)):

It shall be an unfair labor practice for an employer –
(5) to refuse to bargain collectively with the representatives of his employees . . . .

Section 10(e) (29 U.S.C. § 160(e)):

The Board shall have power to petition any court of appeals of the United States . . . wherein the unfair labor practice occurred or wherein such person resides or transacts business, for the enforcement of such order . . . No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.  The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive . . . .

Section 10(f) (29 U.S.C. § 160(f)):

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia . . . .

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

PRIME HEALTHCARE CENTINELA, LLC *
d/b/a CENTINELA HOSPITAL MEDICAL CENTER *
 * Nos. 15-1436,
  Petitioner/Cross-Respondent *  16-1037
 *
  v. *
 * Board Case No.
NATIONAL LABOR RELATIONS BOARD * 31-CA-030055
 *
  Respondent/Cross-Petitioner *
 *
  and *
 *
SEIU UNITED HEALTHCARE WORKERS-WEST *
 *
  Intervenor *

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2016, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify that the foregoing document was served on all those parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not by serving a true and correct copy at the addresses listed below:

David Scott Gallacher
Sheppard Mullin Richter & Hampton LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC 20006

David A. Rosenfeld
Bruce Harland
Weinberg Roger & Rosenfeld
1001 Marina Village Parkway
Alameda, CA 94501-6430

/s/Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, SE

Dated at Washington, DC          Washington, DC 20570
this 17th day of June, 2016      (202) 273-2960