**RECORD NOS. 15-1436(L); 16-1037**

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals

### For The District of Columbia Circuit

## PRIME HEALTHCARE CENTINELA, LLC,
## d/b/a CENTINELA HOSPITAL MEDICAL CENTER,

*Petitioner/Cross-Respondent*,

**v.**

## NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*,

-----------------------------------------------------------------------------------------------------------

### SEIU UNITED HEALTHCARE WORKERS-WEST,

*Intervenor for Repsondent*.

## ON APPEAL FROM THE NATIONAL LABOR RELATIONS BOARD

_____

### BRIEF OF PETITIONER/CROSS-RESPONDENT

_____

Jason W. Kearnaghan
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
 A LIMITED LIABILITY PARTNERSHIP
 INCLUDING PROFESSIONAL CORPORATIONS
333 South Hope Street, 48th Floor
Los Angeles, California  90071
(213) 620-1780

*Counsel for Petitioner/Cross-Respondent*

**CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES, AND CORPORATE DISCLOSURE STATEMENT**

**(A) Parties and Amici**

Based on the knowledge and information reasonably available to Petitioner, the following persons are parties, intervenors, and amici in this Court:

1.    Petitioner and Cross-Respondent Prime Healthcare Centinela, LLC d/b/a Centinela Hospital Medical Center ("Petitioner" or "Prime Centinela"): Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioner discloses that it is a wholly owned subsidiary of Prime Healthcare Services, Inc.  Through subsidiary entities, Prime Healthcare Services, Inc. owns and operates 42 hospitals located throughout the United States.  Prime Healthcare Services, Inc. created Prime Healthcare Centinela, LLC d/b/a Centinela Hospital Medical Center to facilitate Prime Healthcare's acquisition of Centinela Hospital Medical Center, which is located in Inglewood, California.  Prime Healthcare Centinela, LLC d/b/a Centinela Hospital Medical Center was the Respondent in the administrative action before the National Labor Relations Board that resulted in the decision that is the basis for this Petition for Review.

2.    Respondent National Labor Relations Board.

3.    Intervenor for Respondent SEIU-United Healthcare Workers-West.

This case was not brought in the District Court.  Therefore, no parties, intervenors, or amici appeared in this case before the District Court.  Nor did any

other parties, intervenors, or amici appear in the administrative action in front of the National Labor Relations Board.

### (B) Rulings Under Review

The ruling at issue before this Court is that portion of the Order of the National Labor Relations Board in *Prime Healthcare Centinela, LLC d/b/a Centinela Hospital Medical Center and SEIU-United Healthcare Workers-West*, 364 NLRB No. 44 (2015), entered on November 24, 2015, finding that Petitioner failed to provide relevant information requested by the Union in violation of Section 8(a)(5) and (1) of the National Labor Relations Act (codified at 29 U.S.C. § 158(a)) and that the parties were not at impasse when Petitioner implemented its healthcare proposal on January 1, 2011. The Order was written by Chairman Pearce and Members Miscimarra and Hirozawa of the National Labor Relations Board. The ruling at pages 1-5 of the Order is at issue in this appeal. At this time, no official citation for the ruling exists.

### (C) Related Cases

This case has not been previously on review before this Court or any other Court. Counsel for Petitioner is unaware of any other related cases currently pending in this Court or in any other court.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES
AND CORPORATE DISCLOSURE STATEMENT ................................................. i

TABLE OF CONTENTS ......................................................................... iii

TABLE OF AUTHORITIES .................................................................... v

GLOSSARY ........................................................................................ x

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF THE ISSUES FOR REVIEW ..................................... 3

STATUTES AND REGULATIONS ......................................................... 4

STATEMENT OF THE CASE ................................................................. 4

     A.    The Parties And The Expired Collective Bargaining Agreement ......... 4

     B.    The Parties' Representatives ................................................. 6

     C.    The Parties' Fall 2009 Pre-Negotiations Discussions ......................... 7

     D.    The Parties' December 2009 Bargaining Sessions .............................. 9

     E.    Prime Centinela Provided The Union With Its Initial EPO And
          Employee Premium Sharing Proposal In Early 2010 .......................... 9

     F.    Seeking To Reach An Agreement On Implementation Of The
          EPO Plan On July 1, 2010, Prime Centinela Offers To Continue
          Free Coverage ....................................................................... 13

     G.    The Union Rejects Prime Centinela's Final Concession To
          Achieve A New Collective Bargaining Agreement Prior To The
          January 1, 2011 Effective Date Of The EPO ................................. 30

H.      The Parties' Communications In 2011 Confirm The Continuing Existence Of The Impasse In Bargaining.............................................32

I.      Procedural History...............................................................................36

SUMMARY OF ARGUMENT .........................................................................37

STANDING .......................................................................................................38

ARGUMENT .....................................................................................................39

A.      Standard of Review ............................................................................39

B.      The NLRB Applied the Wrong Legal Standards and Improperly Departed from Established Precedent .................................................39

1.      The Board Erred In Concluding That Prime Centinela Unlawfully Failed to Provide Relevant Information Request By The Union On July 23, 2010 ..................................39

a.      The Board's Conclusion That Prime Centinela Violated The Act By Failing To Provide The Union With All Information Requested By Its July 23, 2010 Letter Is Contrary To The Law And The Facts ...............................................................................40

2.      Contrary to the NLRB Decision, The Parties Were At Impasse When Prime Centinela Implemented the EPO Plan.................................................................................47

a.      The Uncontroverted Evidence Supports Prime Centinela's Determination That The Parties Were At Impasse .........................................................................50

CONCLUSION..................................................................................................58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

iv

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACF Industries*,
    347 NLRB 1040 (2006).................................................................45

*AMF Bowling Co.*,
    314 NLRB 989 (1994)..................................................................55

*Aramark Corporation*,
    353 NLRB 993 (2009)..................................................................42

*Bell Transit Co.*,
    271 NLRB 1272 (1985)................................................................49

*Bio-Science Laboratories*,
    209 NLRB 796 (1974)..................................................................49

*Bloomsburg Craftsmen*,
    276 NLRB 400 (1985)............................................................48, 55

*Bohemia, Inc.*,
    272 NLRB 1128 (1984)................................................................43

*California Pacific Medical Center*,
    356 NLRB No. 159 (2011)...........................................................49

*CalMat Co.*,
    331 NLRB 1084 (2000)................................................................49

*Coca-Cola Bottling Co.*,
    311 NLRB 424 (1993)............................................................42, 45

*\*Columbus Products Company*,
    259 NLRB 220 (1981)............................................................44, 45

*\*Chief Authorities are Designated by an Asteirsk.*

*Comau, Inc. v. NLRB*,
  671 F.3d 1232 (D.C. Cir. 2012)....................................................48

*\*Detroit Edison Co. v. NLRB*,
  440 U.S. 301 (1979)......................................................40, 41, 42

*\*E.I. DuPont & Co.*,
  268 NLRB 1075 (1984)............................................48, 50, 55, 56

*Financial Institution Employees Local 1182 v. NLRB*,
  750 F.2d 757 (9th Cir 1985) .......................................................49

*General Electric Co. v. NLRB*,
  916 F.2d 1163 (7th Cir. 1990) ....................................................42

*Georgia-Pacific Corp.*,
  305 NLRB 112 (1992)..........................................................49, 56

*Graphic Comm. Intl. Union v. NLRB*,
  977 F.2d 1 (7th Cir. 1992) ................................................45, 53, 54

*Griffith Co. v. NLRB*,
  545 F.2d 1194 (9th Cir. 1976) ......................................................2

*Hertz Corp. v. NLRB*,
  105 F.3d 868 (3d Cir. 1997) .......................................................43

*Hi-Way Billboards*,
  206 NLRB 22 (1973).................................................................48

*Holiday Inn Downtown - New Haven*,
  300 NLRB 774 (1990).................................................................55

*Hyatt Regency Memphis*,
  296 NLRB 289 (1989), *overruled on other grounds by*
  *McClatchy Newspapers*, 321 NLRB 1386 (1996)..................................49-50

*Kovach v. NLRB*,
  229 F.2d 138 (7th Cir. 1956) ........................................................2

*Litton*,
      300 NLRB 324 (1990) ...................................................................47

*Litton Fin. Printing v. NLRB*,
      501 U.S. 190 (1991)......................................................................39

*\*Local 13, Detroit Newspaper Printing and
Graphic Communications Union v. NLRB*,
      598 F.2d 267 (D.C. Cir. 1979).....................................................45

*Lou Stechers Super Markets*,
      275 NLRB 71 (1985) ....................................................................49

*Mail Contractors of America v. NLRB*,
      514 F.3d 27 (D.C. Cir. 2008)........................................................39

*\*Matanuska Electrical Assn.*,
      337 NLRB 680 (2002) ..................................................................49

*NLRB v. A.S. Abell Co.*,
      624 F.2d 506 (4th Cir. 1980) ........................................................43

*NLRB v. Acme Industrial Co.*,
      385 U.S. 432 (1967)......................................................................40

*NLRB v. American Nat'l Ins. Co.*,
      343 U.S. 395 (1952).......................................................................56

*NLRB v. Truitt Manufacturing Co.*,
      351 U.S. 149 (1956)................................................................40, 41

*Ohio Power Co.*,
      216 NLRB 987 (1975), *enfd.*
      531 F.2d 1381 (6th Cir. 1976) ......................................................43

*\*Peterbilt Motors Co.*,
      357 NLRB No. 13 (2011) .................................................43, 46, 54

*Procter & Gamble Co. v. NLRB*,
      603 F.2d 1310 (8th Cir. 1979) ......................................................41

*Redburn Tire Co.*,
    358 NLRB No. 109 (2013) .............................................................47

*Retail Clerks Union, etc. v. NLRB*,
    348 F.2d 369 (D.C. Cir. 1965).......................................................38

*Saginaw Control & Engineering, Inc.*,
    339 NLRB 541 (2003) ...................................................................42

*Titanium Metals Corp. v. NLRB*,
    392 F.3d 439 (D.C. Cir. 2004).......................................................39

*U.S. Postal Serv.*,
    308 NLRB 1305 (1991) .................................................................44

*Wachter Construction Co. v. NLRB*,
    23 F.3d 1378 (8th Cir. 1994) .........................................................45

*Western Publishing Co.*,
    269 NLRB 355 (1984) ...................................................................50

*Whittier Area Parents' Ass'n*,
    296 NLRB 817 (1989) ...................................................................47

## STATUTES

29 U.S.C. § 152 .....................................................................................1

29 U.S.C. § 158(a) ................................................................................3

29 U.S.C. § 158(a)(1)..................................................................3, 4, 39, 39

29 U.S.C. § 158(a)(5).......................................... 3, 4, 36, 39, 40, 41, 42, 44, 47

29 U.S.C. § 160 .....................................................................................2

29 U.S.C. § 160(a) ................................................................................1

29 U.S.C. § 160(b) ................................................................................1

29 U.S.C. § 160(c) ...................................................................................1

29 U.S.C. § 160(f) ................................................................................1, 38

**RULES**

D.C. Cir. R. 28(a)(4) .............................................................................1

Fed. R. App. P. 15(a)(1) ........................................................................2

Fed. R. App. P. 28(a)(4) ........................................................................1

Fed. R. App. P. 28(a)(5) ........................................................................3

# GLOSSARY

| | |
|---|---|
| ***Centinela*** | Centinela Hospital Medical Center: a hospital located in Inglewood, California which is owned and operated by Petitioner Prime Centinela and at which the bargaining unit at issue in this case is employed. |
| ***Encino*** | Encino Hospital Medical Center: a hospital located in Encino, California which is owned and operated by a subsidiary of Prime Healthcare Services, Inc. and which contains a bargaining unit represented by SEIU-United Healthcare Workers-West. |
| ***EPO*** | Exclusive provider organization plan: a type of insurance plan in which participants are generally required to use network providers that participate in the plan and which do not require participants to select a primary care physician or contact their primary care physician for referrals to specialists. |
| ***Garden Grove*** | Garden Grove Hospital Medical Center: a hospital located in Garden Grove, California which is owned and operated by Prime Healthcare Services, Inc. and which contains a bargaining unit represented by SEIU-United Healthcare Workers-West. |
| ***HMO*** | Health maintenance organization plan: a type of insurance plan in which participants are generally required to use network providers that participate in the plan and select a primary care physician. |
| ***July 23 Request*** | The request for information dated July 23, 2010 which was submitted to Prime Centinela by the Union, and which is at issue in this case. |
| ***LBF*** | A negotiating party's "last, best, and final" offer. |

| | |
|---|---|
| ***Order or Board's Order*** | The decision issued by the National Labor Relations Board on November 24, 2015, which is the subject of this Petition for Review. |
| ***PPO*** | Preferred provider organization plan: a type of insurance plan in which participants may choose to use network or non-network providers, but where use of non-network providers results in lower level of benefits and higher out-of-pocket costs. |
| ***PCP*** | Primary care physician: a physician who typically provides both the first contact for a person with an undiagnosed health concern as well as continuing care of varied medical conditions, not limited by cause, organ system, or diagnosis. |
| ***Prime Centinela*** | Petitioner Prime Healthcare Centinela, LLC d/b/a Centinela Hospital Medical Center. |
| ***Prime*** | Prime Healthcare Services, Inc., which is the parent company of Petitioner Prime Centinela. |
| ***SPD*** | Summary plan description, which document that summarizes a participant's rights, benefits, and responsibilities under an insurance plan or policy. |
| ***TA or TA'd*** | Tentative agreement: the process by which parties at the negotiating table sign-off on smaller portions (*e.g.*, articles) of the Collective Bargaining Agreement as the negotiation process proceeds. The effect of the TAs is often contingent on the parties reaching agreement on the entire Collective Bargaining Agreement. |
| ***Union*** | SEIU-United Healthcare Workers-West, which is the union that represents the bargaining unit at issue in this case. |

## JURISDICTIONAL STATEMENT

Pursuant to Federal Rule of Appellate Procedure ("FRAP") 28(a)(4) and Circuit Rule 28(a)(4), Petitioner Prime Healthcare Centinela, LLC d/b/a Centinela Hospital Medical Center ("Prime Centinela" or "Petitioner") submits that Respondent, the National Labor Relations Board ("NLRB" or "the Board"), had jurisdiction over the underlying dispute which is the subject of this Petition pursuant to 29 U.S.C. §§ 160(a)-(c). Section 160(a) states that the Board "is empowered to prevent any person from engaging in any unfair labor practice . . . affecting commerce." Sections 160(b) and (c) give the Board the authority to issue complaints, conduct hearings, and issue orders with regard to a charge that any person is engaging in an unfair labor practice. The issue before the Board in this case was a labor dispute affecting interstate commerce between an employer and a labor organization as defined by 29 U.S.C. § 152. (V Joint Appendix ("J.A.") at 2325.)[1]

The Court has jurisdiction to hear this petition pursuant to 29 U.S.C. § 160(f), which states that any person aggrieved by a final order of the Board may obtain a review of such order in the United States Court of Appeals for the District of Columbia. Prime Centinela is aggrieved by the Board's Order because it is the entity against whom the Order was entered. (V J.A. 2325.)

---

[1] Citations to the Joint Appendix are formatted as follows: "([volume number] J.A. [page number(s)].)"

This Petition is timely. The Board issued its Order on November 24, 2015. (*Id.*) FRAP 15(a)(1) states that "[r]eview of an agency order is commenced by filing, within the time prescribed by law, a petition for review with the clerk of a court of appeals authorized to review the agency order." Neither Rule 15(a)(1) nor 29 U.S.C. § 160, which sets forth the procedure for judicial review of the Board's orders, sets a deadline for the filing of a petition for review. Recognizing this lack of a set deadline, courts have held that "[t]he party challenging the timeliness of a petition must show that more time has elapsed than reasonably necessary and that it was prejudiced by the delay." *Griffith Co. v. NLRB*, 545 F.2d 1194, 1197 n.3 (9th Cir. 1976); *Kovach v. NLRB*, 229 F.2d 138, 141 (7th Cir. 1956). In this case, Prime Centinela filed the Petition for Review on December 2, 2015, just eight days after the Board issued the Order and as soon as reasonably practicable. No prejudice could have resulted from the short time between issuance of the Order and the filing of the Petition. The Petition is timely.

Last, the Petition for Review seeks the Court's review of a final order of the NLRB that disposes of all of the parties' claims. The NLRB issued a final Order holding that Prime Centinela violated the National Labor Relations Act ("NLRA" or "the Act") by failing to provide the Union with information that the Union requested to evaluate Petitioner's healthcare proposal, by distributing a memorandum to its employees announcing that it would be implementing its new

2

EPO healthcare plan and implementing that plan before impasse had been reached, and by failing to bargain in good faith with the Union. (V J.A. 2325.) Prime Centinela challenges these conclusions, and this Court's review will dispose of all related claims.

## STATEMENT OF THE ISSUES FOR REVIEW

Pursuant to FRAP 28(a)(5), Prime Centinela submits that the following issues are before the Court for review:

1.     Whether Respondent, the Board, erred in affirming the administrative law judge's determination that Prime Centinela failed to provide relevant information requested by the Union in violation of Section 8(a)(5) and (1)[2] of the Act (codified at 29 U.S.C. § 158(a)); and

2.     Whether Respondent, the Board, erred by determining that the parties were not at impasse when Petitioner implemented its healthcare proposal on January 1, 2011.

---

[2] The format of this citation reflects that in the Order.

3

## STATUTES AND REGULATIONS

Following is the text of the two main statutes at issue in this appeal:

29 U.S.C. § 158(a)(1):

> It shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.

29 U.S.C. § 158(a)(5):

> It shall be an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

## STATEMENT OF THE CASE

**A.     The Parties And The Expired Collective Bargaining Agreement.**

Prime Healthcare Services, Inc. ("Prime") is the parent corporation of Prime Centinela.  Through subsidiary entities, Prime owns and operates more than a dozen hospitals in Southern California, including Centinela Hospital ("Centinela"), Garden Grove Hospital ("Garden Grove") and Encino Hospital ("Encino"), as well as hospitals in Northern California, Nevada, Texas and Pennsylvania.  (II J.A. 573:10-574:1.)   SEIU-United  Healthcare  Workers-West ("Union" of "UHW") represents the Centinela Hospital bargaining unit at issue in this case, as well as bargaining units at the Garden Grove and Encino facility.  (II J.A.419:18- 420:14.)

Notably, the Union has represented employees of Centinela since at least 2003, when Centinela was owned by Tenet Health Systems. (*Id.*)

In November 2007, Prime Centinela purchased Centinela Hospital and assumed the Tenet-Union agreement. (*Id.*) Although Prime Centinela and the Union agreed to most of the terms for a successor agreement, they were unable to reach final agreement on nine separate contract provisions, including Article 15 relating to health insurance benefits. Pursuant to the provisions of the Tenet-Union agreement, the parties submitted their "last, best and final" ("LBF") proposals on each of the disputed articles to arbitration before Arbitrator R. Douglas Collins, who ultimately selected the language that is included as Article 15 in the collective bargaining agreement between the Union and Prime Centinela which expired on December 31, 2009, and that language provided as follows:

**ARTICLE 15- STANDARD BENEFIT PLANS**

> Bargaining Unit members shall be eligible to participate in the Facility's Paid Time Off (PTO) and standard benefit plans. The Facility shall continue to offer, directly or indirectly, the following core benefits during the term of this Agreement: Paid Time Off (PTO), HMO medical plan, PPO medical plan, dental plan, long term and short-term disability plans, life insurance and 401(K) plan. The Facility shall continue to maintain an HMO medical insurance option for full-time and part-time Bargaining Unit members and their families which will not require any employee payroll contributions.

(III J.A. 893-894; *see also* V J.A. 2048-2063, 2064-2149.)   The HMO and PPO

medical plans referenced in Article 15 were offered through Anthem Blue Cross.

(*Id.*)   Importantly, and as indicated, employees were not required to contribute

anything towards the HMO benefit no matter what level of coverage they enrolled

for (employee only, employee plus spouse, employee plus child(ren), or employee

plus family.  (I J.A. 81:18-84:6; III J.A. 845-924.)

**B.     The Parties' Representatives.**

Daniel Bush has represented the Union with respect to legal matters since

approximately August 2009, and was chief spokesperson for the Union in

negotiations with Prime Centinela until approximately September 2011.   (II

J.A.78:3-11.) At that time, he was replaced as chief spokesperson by Richard

Ruppert.  (II J.A. 419:25-420: 5.)  During the first collective bargaining sessions

held in December 2009, Prime Centinela's chief spokesperson was Prime Assistant

General Counsel Radha Savitala.  (II J.A. 580:4-10.)  In January 2010, Savitala

was replaced by Mary Schottmiller, who had recently been hired by Prime as

Assistant General Counsel.  (I J.A. 78:3-11.)  Throughout 2009 and early 2010,

Tammy Valle was Senior Account Manager at Keenan & Associates, the benefits

broker and administrator for Prime Centinela and other Prime hospitals, with

primary responsibility for health insurance and other benefits offered at Prime

hospitals.   (II J.A.723:4-725:26.)  In April 2010, Valle was hired by Prime as

6

Corporate Benefits Manager. In her new position Valle continued to be responsible for corporate-wide benefits for Prime, including health insurance and other benefits at Centinela, Garden Grove and Encino.  (*See*, *i.e.*, I J.A. 78:3-11, 324:6-325:4, 365:13-23; II J.A. 572:1-573:3, 723:4-725:26.)

## C.    The Parties' Fall 2009 Pre-Negotiations Discussions.

In Fall 2009, representatives of the SEIU and Union, including Bush, held a series of meetings with Prime representatives as a prelude to upcoming contract negotiations for the SEIU/Union represented bargaining units at Centinela, Encino, Garden Grove and one additional facility.   (I J.A.:7-14.)   During the course of these meetings, the labor representatives raised "concerns" about septicemia rates at Prime hospitals.[3]  (*Id*.)   The Prime representatives were told that the Union was interested in "fixing" the septicemia problems "quickly and quietly" but if Prime was not interested in working with the Union then the parties would proceed to negotiations.  (*Id*.)  The Prime representatives did not accept the purported "offer." (*See* I J.A. 315:18-318:12, 324:6-328:14.)

In a November 2, 2009 letter to the Hospital's then CEO and Savitala, Bush claimed that the Union had identified a "systemically high" level of septicemia claims at Prime hospitals.  (III J.A.1109-1112.)   The letter requested a variety of documents including operational reports that are required to be filed by hospitals

---

[3] Septicemia is a blood disease often contracted at medical centers or hospitals.

operating in California, reports containing patient treatment information, information relating to coding procedures, and various other operational and health-care related documents. (III J.A. 1109-1112.) Savitala responded to the Union's information request by letter dated November 12, 2009 wherein Prime Centinela denied the Union's assertions and pointed out numerous other flaws in the Union's requests. (IV J.A. 1329-1332.) Prime Centinela's letter also advised that the Union's requests appeared to be made for purposes of harassment rather than good faith bargaining, but nonetheless offered to meet with the Union to discuss the requests, stating:

> Based upon all of the foregoing, it appears as if the UHW is more interested in employing oppressive tactics to gain an advantage in negotiations rather than engaging in good faith negotiations for a successor collective bargaining agreement. CHMC will not tolerate such tactics and will not be extorted. That being said, if UHW truly wishes to engage in good faith negotiations and believes the requested information is relevant to such negotiations, CHMC is willing to meet with UHW to discuss the requests and attempt to reach an agreement on an appropriate scope.

(*Id.* at 1332.) The Union did not respond to Prime Centinela's letter or accept its invitation to meet, and Prime Centinela did not provide any information requested by the Union's letter. (I J.A.144:19-21.)

8

**D.    The Parties' December 2009 Bargaining Sessions.**

The parties held four bargaining sessions in December 2009. At the December 4, 2009 session, the Union made a complete contract proposal. (IV J.A. 1333-1419.) The Union's Article 15 proposal included the Anthem Blue Cross HMO at no cost to employees at any level of coverage. (*Id.* at 21387) ("the Facility shall continue to maintain an HMO medical insurance option for full-time and part-time Bargaining Unit members and their families which will not require any employee payroll contribution.") The Union's proposal also included additional language freezing all employee deductibles and copayments for the term of the agreement. (*Id.*) Prime Centinela's counterproposal was delivered to the Union on December 29, 2009 and included language permitting Prime Centinela to modify health insurance benefits at Prime Centinela's discretion during the term of the agreement. (III J.A. 925.) ("these benefits may be amended from time-to-time.") Prime Centinela also advised the Union that Prime Centinela could no longer provide free health insurance benefits to its employees. (I J.A. 341:8-16.)

**E.    Prime Centinela Provided The Union With Its Initial EPO And Employee Premium Sharing Proposal In Early 2010.**

Schottmiller started with Prime in January 2010. (II J.A. 78:3-11.) Almost immediately after her hire, Schottmiller reviewed the status of bargaining at Centinela and she prepared a chart of open items that she then provided to Bush. (II J.A. 580:4-581:18; IV J.A. 1420-1241.) During the bargaining session on

9

February 4, 2010 the parties discussed health insurance issues, including the Prime EPO. (II J.A. 585:5-591:5.) Schottmiller advised the Union that Prime Centinela would have Valle attend the next bargaining session because she had greater familiarity with the plan. (II J.A. 584:12-585:4; V J.A. 2165.) The parties engaged in extensive discussions about health insurance and the Prime EPO program during a February 5, 2010 meeting. (II J.A. 585:5-591:5.) Bush acknowledged that he had attended a presentation from Keenan & Associates on the Prime EPO in October 2009, and Schottmiller advised the Union that the EPO was in place at all other Prime hospitals and Prime Centinela wanted to roll it out at Centinela. (II J.A. 585:19-21.) Bush stated that he did not trust Prime to have a self-insured plan and requested information about the EPO, including whether stop loss insurance was in place, and also stated that the Union wanted to maintain the free health insurance for all levels of coverage that was currently in place at Centinela. (*See*, *i.e.*, II J.A. 585:5-590:2; V J.A. 2167-2168.) During the meeting, Bush also made statements that Prime had lots of money, its proposals were "not close to acceptable" and that Prime Centinela "better have an enormous amount of movement." (V J.A. 2167.) The Union underscored its "disappointment" with Prime Centinela's proposals by unilaterally cancelling the negotiating session that had been scheduled for February 11, 2010. (IV J.A. 1422.)

The parties held another bargaining session on February 16, 2010. (II J.A. 601:19-20.) The day prior, Schottmiller provided Bush with an advance copy of the Article 15 proposal Prime Centinela would be making at the session. (IV J.A. 1425-1431.) The proposal specifically referenced providing employees with EPO and PPO medical plan options and included a premium contribution schedule requiring employees to pay premiums for coverage under the EPO "base" plan at all levels of coverage except employee only. (IV J.A. 1429-1430.)

At the actual bargaining session, Schottmiller presented Prime Centinela's Article 15 proposal and a presentation was made by Valle and Jim Stefnak, another Keenan & Associates representative. (II J.A. 601:15-602:12.) During the presentation and ensuing discussions, the Union was advised that if employees did not wish to select the EPO and utilize the Prime network, they would be able to access the Anthem network through the PPO option. (II J.A. 604:1-605:4.) Valle also provided the Union with a chart she had prepared comparing the Centinela health insurance benefit options to the benefits offered through the Prime "Legacy EPO Plan," and explained the differences between the two. (*Id.*; III J.A. 929-931.) Valle explained the design of the EPO, including the requirement of utilizing a Prime primary care physician ("PCP") to receive a referral to a specialist both in and outside of the Prime network. (II J.A. 604:1-605:4.) Valle also discussed that employees could nominate their current primary physician for inclusion in the

Prime network, at which point Valle would reach out to the physician to request that the physician join the network. (*Id.*) Schottmiller also provided information responsive to certain requests made by the Union at the February 5, 2010 session, and the Union requested additional information relating to the EPO and the employee premium contribution amounts. (*Id.*) The parties also discussed that the EPO was in place at Encino and Garden Grove, both Union-represented facilities. (III J.A. 926-928, 929-931; V J.A. 2173-2175; II J.A. 601:12-605:18, 730:11-732:19; IV J.A. 1423, 1424, 1425-1431.)

In light of the Union's questions and apparent confusion over the EPO and PPO program, Valle revised the comparison chart she had provided to the Union on February 16, 2010 and then provided the revised chart to Schottmiller, along with a dental/vision comparison chart and a Prime network physician list. ( II J.A.732:20-733:16.) Schottmiller gave this to Bush at the next negotiating session on March 11, 2010. ( II J.A. 622:9-623:10) During that session, the parties exchanged proposals and TA'd[4] the Union's grievance proposal, but did not discuss health insurance. (II J.A. 622:9-627:12, 730:11-733:19; III J.A. 1096-1096; IV J.A. 1432-1476, 1477, 1498-1501; V J.A. 2176-2179, 2233-2236.)

---

[4] The initials "TA" are an acronym referring to a tentative agreement between the parties.

12

**F.     Seeking To Reach An Agreement On Implementation Of The EPO Plan On July 1, 2010, Prime Centinela Offers To Continue Free Coverage.**

On March 26, 2010 Schottmiller sent Bush an email stressing the importance to Prime Centinela of resolving the EPO issue prior to expiration of the Anthem plan on July 1, 2010 and making a major concession to entice the Union into agreeing to implementation.  (II J.A. 841-842.)  The urgency of the situation was further emphasized by Schottmiller's email to Bush sent the following day with the same message, as well as Schottmiller's March 30, 2010 email to Bush asking if he had received the prior emails (IV J.A. 1502, 1503), and by the follow-up email sent on April 14, 2010, more than two weeks after Prime Centinela's March 26, 2010 concessionary proposal, asking Bush why he had not responded and reiterating the March 26, 2010 proposal.  (IV J.A. 1505.)

Bush finally responded on April 19, 2010 almost four weeks after Prime Centinela's March 26, 2010 proposal, and rejected the proposal without question or explanation.  (III J.A. 933.)  Schottmiller responded within an hour of Bush's April 19, 2010 email, expressing disappointment with the Union's position.  (IV J.A. 1506.)

On April 23, 2010, Schottmiller sent Bush a letter reiterating and expanding upon the importance of Prime Centinela's EPO proposal to the prospects for the parties to reach a final agreement.  (III J.A.935-936.)  Schottmiller and Valle were also in communication during this period, with Schottmiller advising Valle that

moving Centinela to the EPO on July 1, 2010 would be dependent on the outcome of negotiations with the Union.  (V J.A. 2237-2238.)

The importance of the EPO proposal, at least to Prime Centinela, was also underscored by discussions during the May 3, 2010 bargaining session.  Here, Schottmiller made clear that there would be no collective bargaining agreement without the EPO.  (II J.A. 634:6-635:9.)  She again explained that the EPO had already been implemented at all other Prime hospitals, including Garden Grove and Encino (both Union-represented facilities), as of January 1, 2010.  (*Id.*; V J.A. 2163-2232.)  Bush responded by emphasizing the importance to the Union that all levels of coverage for the basic plan be free to employees (no premium sharing) and requesting information relating to the EPO, including "quality of care" information, that should have been requested by the Union when the Prime Centinela made its first EPO proposal in February.  (II J.A. 635:7-9.)  The Union made no counterproposal with respect to the EPO or health insurance notwithstanding the emphasis placed on the issue by Prime Centinela.  (*See*, *i.e.*,  I J.A. 365:1-23; II J.A. 631:20-639:2;  III J.A. 1087-1090; IV J.A. 1508-1521; V J.A. 2181-2186.)

The parties held another bargaining session on May 6, 2010.  Prior to the bargaining session, Bush emailed Schottmiller the Union's proposal made on December 4, 2009 as well as the Union's opening wage proposal, advising that the

Union was "not re-proposing these items at this time" but just wanted to ensure that Schottmiller had the proposals.  (I J.A. 367:19-22; II J.A. 637:25-639:2; IV J.A. 1522-1523, 1524-1613; V J.A. 2187-2191.)  At the meeting, the Union again made no counterproposal to Prime Centinela's EPO proposal - professing that it was "ready to bargain about it but not yet today."  (*Id*.)  The parties also discussed the premium sharing component of Prime Centinela's EPO proposal, with the Union making clear its position that it would not agree to premium sharing for any level of coverage for the base plan.  (*Id*.)

On May 7, 2010, Schottmiller emailed Bush requested documents relating to Prime Centinela's EPO Plan proposal.  (IV J.A. 1614-1634.)  Included within the documents was the chart comparing the historical HMO/PPO plan available at Centinela to the EPO plan proposed by Prime Centinela, as well as a comparison of the Centinela HMO/PPO plan to the EPO plan that had been implemented at Encino and Garden Grove.  (*Id*.)  Bush responded to the information provided by Schottmiller by email later the same day confirming that he had received the information.  (IV J.A. 1635.)

On May 24, 2010, Schottmiller emailed Bush the summary plan descriptions ("SPD") for the EPO and for the PPOs being proposed by Prime Centinela.  (IV J.A. 1636-1795.)  The SPD for the EPO included the requirement, previously explained to the Union during the parties' February 16, 2010 meeting and included

15

in the comparison chart Schottmiller emailed to Bush on May 7, 2010 (IV J.A. 1614-1634), that employees covered by the base EPO would be required to obtain a referral from a Prime PCP in order to access services at an Anthem facility.  (IV J.A. 1727 ) (SPD, p. 3). Also consistent with the explanation provided to the Union at the February 16, 2010 meeting and in the comparison chart provided on May 7, 2010, the SPD for the PPO plan did not require that the participating employee utilize physicians or facilities within the Prime network, select a Prime PCP, or receive a referral from a Prime PCP prior to accessing services from an Anthem provider. (*Id.* at p. 9) (PPO SPD at p. 3.)

Bush replied within twenty minutes, noting that the information provided did not include the quality of care information requested by the Union's May 4, 2010 letter.  (IV J.A. 1635.)  Schottmiller replied by advising Bush that Prime Centinela was reviewing whether it had an obligation to provide those documents.  (*Id.*) During this period of time, the Union also requested to cancel the bargaining sessions that had been scheduled for June 1 and 2, 2010 (II J.A. 642:18-22.), and Schottmiller came to the conclusion that the Union would not agree to the EPO prior to July 1, 2010, and probably not ever.  (II J.A. 631:20-639:21.)  Prime Centinela therefore was required to renew the Anthem Blue Cross policy set to expire on July 1, 2010 despite the exorbitant cost of doing so.  (*See*, *i.e.*, II J.A. 631:20-639:21; V J.A. 2239-2241, 2242.)

16

By letter dated June 1, 2010, Schottmiller formally responded to the Union's May 4, 2010 information request.   (III J.A. 1091-1092.)  Schottmiller advised the Union that the "quality of care" information request was not relevant, and also advised the Union where information relating to quality of care was publicly available.  (III J.A. 1091-1092.)  The next bargaining session was held on June 14, 2010.  At this session the Union made its first proposal on health care since its initial proposal on December 2009.   (III J.A. 1097.)   In the proposal, the "employee premium contribution rates" for the "EPO medical plan" referenced in the Union's proposal included "zero," or free, EPO benefits at all levels of coverage.  (*Id.*)  The Union's proposal also rejected the component of Prime Centinela's EPO Plan establishing a "closed" network/Prime PCP referral requirement for employees covered by the base EPO benefit by allowing employees to access the Anthem network without first receiving a referral.  (*Id.*)

During discussions of the Union's proposal, Bush complained that there was not a lot of flexibility in Prime Centinela's EPO proposal, which he claimed was a problem for the Union.    (I J.A. 368:20-371:23; II J.A. 642:18-644:22; V J.A. 2192-2193.)   Bush also expressed the Union's opposition to requiring premium sharing for EPO base coverage.   (*Id.*)  Schottmiller responded that the Hospital believed that all employees, both union and non-union, should be required to pay the same for health insurance benefits.  (*Id.*)

17

The parties met again the following day, June 15, 2010.  (I J.A. 133:23-24.)

The meeting was also attended by Valle, who again explained that the EPO had

already been implemented at all other Prime hospitals in place of the Anthem

HMO.   The parties discussed the Prime PCP requirement under Prime Centinela's

EPO proposal, and that employees who wished to continue in the Anthem network

would be required to sign up for coverage under the PPO plan.  (I J.A. 133:23-

136:23; II J.A. 719:13-720:3.)  The parties also held additional discussions on what

the Union believed to be the limited number of physicians associated with the

Prime network, with Bush specifically complaining about the lack of OB/GYN

services in the network. (*Id.*)  The Union was told that employees could nominate

their current PCPs for inclusion within the Prime network in order to assist in

expanding the network.  (I J.A. 133:23-136:23;  II J.A. 719:13-720:3.)  The Union

then requested and received the nomination form to be utilized for that purpose.  (I

J.A. 371:1-6.)   Schottmiller also reiterated that the Prime PCP requirement in

Prime Centinela's EPO proposal was not going to be changed.  (*See*, *i.e.*, I J.A.

368:20-372:23, 396:6-397:6; II J.A. 645:21-646:6; IV J.A. 1799-1800; V J.A.

2194-2199, 2243.)

On June 28, 2010, Prime Centinela provided the Union with additional

information in response to requests made by the Union during the June 15, 2010

meeting, including the 2010 SPD for Encino and Garden Grove, a comparison of

18

Centinela's current HMO/PPO to Prime Centinela's EPO/PPO proposal, and the provider nomination form.     (III J.A. 1099-1102, 1103-1104.)    The email forwarding these materials to the Union also referenced that employees should submit their physician nominations with the attached form, that Prime had a full-time employee working on expanding the network, and that each nominated provider would be contacted both via phone and mail. (*Id.*)

The next meeting was scheduled for July 23, 2010. (II J.A. 650:14-16.) Prior to the meeting Schottmiller sent Bush a chart showing which articles remained opened, which had been tentatively agreed to, and which party had made the last proposal on the open items. (IV J.A. 1801-1802, 1803-1804.) At the July 23, 2010 meeting, the Union handed Prime Centinela a four-page information request (III J.A. 1105-1108, hereinafter also referred to as "July 23 Request") that was substantially the same as the "quality of care" request the Union had made in November 2009, except that the July 23 Request applied to all Prime facilities. (*Compare* I J.A. 143:21-144:5; III J.A. 1105-1108, 1109-1112.)[5]  Bush stated that the information was needed so that the Union could properly evaluate Prime Centinela's EPO Plan proposal inasmuch as employees who signed up for the EPO

---

[5] The July 23 Request sought, *inter alia*: certain regulatory reports from 2001 to the most recent report issued for each Prime facility (PEPPER reports) and any communications between Prime, any of its facilities, and the QIO for California regarding the regulatory reports; the all-payor claims data and hospital occupancy rates per unit for each Prime hospital from 2001 to the present; communications between Prime and government agencies; coding guidelines and consultants; and patient charts. (III J.A. 1105-1108.)

base benefit plan would be required to use Prime hospitals for their medical care. (III J.A. 1105-1108.) Schottmiller responded that the information request was merely a ploy by the Union designed to further its corporate campaign against Prime to obtain organizing rights within the Prime network. (II J.A. 650:14-652:25; III J.A. 1109-1112; I J.A. 143:21-145:5.)

During the July 23, 2010, meeting Prime Centinela also made a counterproposal on Article 15. (I J.A. 145:5-147:25; II J.A. 650:13-652:25; III J.A. 1113-1114.) The proposal maintained Prime Centinela's prior positions, including replacement of the existing HMO benefit with the Prime EPO, including employee premium contributions for EPO base benefits at all levels of coverage except employee only. (III J.A. 1113-1114.) In conjunction with its proposal, Schottmiller informed the Union that Prime Centinela was rejecting the Union's proposal, and in particular the Union's language eliminating the Prime PCP referral requirement and no premium sharing at any level of coverage. (II J.A. 650:13-652:25.) Schottmiller also explained that Prime Centinela was not going to move off of those positions as set forth in its proposal and again explained that the same coverage existed at all other Prime hospitals, employee premiums were similar to what management paid for their coverage, and Prime Centinela was not going to go lower than what was in its proposal. (*Id*.) The Union did not make a

counterproposal to Prime Centinela's EPO proposal.  (I J.A. 145:5-147:25; IV J.A. 1805-1834.)

The next substantive communication between the parties was Schottmiller's August 9, 2010 letter to Bush in which she responded to the July 23 Request and explained why Prime Centinela believed the request was not made for legitimate bargaining purposes.  (III J.A. 1115-1118.)  Schottmiller stated that the information sought was "suspect," in light of Bush's prior statements regarding "the SEIU's desire to wage a corporate campaign against Prime, focusing in part on claims of high septicemia rates at Prime hospitals" and that "the SEIU has notified MPT, a major investor in Prime, of the SEIU's claim that Prime septicemia rates are high." (*Id*.)  She also pointed out that the Union's July 23 Request was "virtually identical" to the Union's November 2009 request.  (*Id*.)  Schottmiller then responded to each of the categories of information sought by July 23 Request. (*Id*.)  For example, she stated that the regulatory reports (and Q10 for the same) "are not relevant to the quality of care at Prime Hospitals" and directed Bush to the myriad publically available governmental reports regarding the care at Prime facilities. (*Id.*)

Bush responded by letter dated August 17, 2010 in which he answered certain statements made by Schottmiller yet notably, did not challenge Schottmiller's assertions that: Bush had made prior statements to Schottmiller and

21

others that the Union wanted to wage a corporate campaign against Prime based on claims of high septicemia rates at Prime hospitals; the SEIU had notified a major investor in Prime of the SEIU's claim that Prime septicemia rates were high; the Union's request was virtually identical to the Union's request made in 2009; the request sought information regarding Prime hospitals that were hundreds of miles away and would not typically be hospitals where Centinela employees would be treated; or that most of the hospitals in the Prime network had only been acquired recently, including Centinela.  (*Compare* III J.A. 1115-1118, 1119-1124.)

During the parties' negotiating session the following day, August 18, 2010, Bush repeated some of the same arguments made in his August 17, 2010 letter.  (II J.A. 656:17-24.)  The Union did not make a counterproposal to Prime Centinela's EPO. (I J.A. 151:3-152:22; IV J.A.1845-1846.)

By letter dated August 23, 2010, Schottmiller again advised Bush that Prime Centinela was working towards implementation of the EPO plan effective January 1, 2011 and intended to distribute the physician nomination form to all Centinela employees.   (III J.A. 1125-1127.)   The following day—August 24, 2010—Schottmiller responded to Bush's August 17, 2010 letter concerning the Union's July 23 Request.   (III J.A. 1128-1129.)   In her letter, Schottmiller again emphasized the importance of resolving Prime Centinela's EPO proposal so that Prime Centinela could be ready for the November 1, 2010 beginning of open

enrollment for the new plan year beginning January 1, 2011. (*Id.*) Schottmiller also requested that Bush meet with her prior to the next scheduled bargaining session to focus on EPO issues and the Union's information request. (*Id.*) Schottmiller also requested information from Valle concerning the cost to renew the Anthem HMO if Prime Centinela was required to do so, and was told the increase would be approximately 40%. (*Id.*)

On August 30, 2010, Bush acknowledged receipt of Schottmiller's August 24, 2010 request to meet to discuss EPO issues and stated that he would confer with his client and get back to her. (IV J.A. 1854.) Three days later, on September 2, 2010 Bush responded to Schottmiller's August 23, 2010 letter regarding Prime Centinela's intention to distribute the physician nomination form to Centinela employees. (III J.A. 1130.) Bush's response asked that Prime Centinela not distribute the form without negotiating with the Union. (*Id.*) Bush also advised in the same email that he and Schottmiller could discuss the issue "when we talk tomorrow morning." (*Id.*)

The following day Bush and Schottmiller had a phone conversation. (II J.A. 660:24-663:13.) During their conversation, Bush advised Schottmiller that the Union was not interested in meeting to discuss the Union's information request or Prime Centinela's EPO proposal, and would only discuss matters at the bargaining table. (*Id.*) Bush emphasized to Schottmiller that the Union was very proud of the

23

fact that they had free health care for all and also reiterated the justifications he had previously made in his letters to Schottmiller regarding the July 23 Request.  (*Id*.) Schottmiller responded that she believed that the whole information request was just a ruse and pointed out that the EPO had been rolled out to the other Prime hospitals where Union members worked, the quality of care issue had not come up at those hospitals and that if there were issues with the quality of care at Prime hospitals, she believed those issues would have been raised by Prime's own employees, particularly since those employees were the ones who were providing the care at the hospitals.  (*Id*.)  Schottmiller and Bush also discussed the status of the negotiations, with Schottmiller advising Bush that the parties appeared to be at impasse on Prime Centinela's EPO proposal and she believed that impasse on that single critical issue would allow implementation of the EPO on January 1, 2010. (*Id*.)  Bush asked Schottmiller for legal authority on the issue and Schottmiller subsequently provided it to him.  (II J.A.660:24-663:13; V J.A. 2213-2214.)

On September 10, 2010, the Union served Prime Centinela with a 10-day notice of the Union's intent to engage in picketing at the hospital.  (V J.A. 1855.) That same day Bush and Schottmiller had an email exchange wherein Schottmiller advised Bush of an incorrect statement that had been made by a supervisor regarding the status of negotiations, and solicited the Union's input on how to address this misstatement.  (V J.A. 1855.)  Thereafter, Bush and Schottmiller

exchanged a number of emails relating to the matter, with Prime Centinela agreeing to post a notice in the supervisor's department reaffirming that the Union continued to represent employees even though the contract had expired and that the negotiations were ongoing; however, the Union rejected Prime Centinela's proposed solution.  (*See*, *i.e.*, IV J.A. 1855, 1856-1857.)

On September 15, 2010, more than three weeks after Schottmiller had first requested that the parties schedule a special meeting to discuss the EPO and the Union's information request, and two weeks after Bush advised Schottmiller that he would consult with his client and get back to her, Bush sent Schottmiller a letter advising that the Union was rejecting Prime Centinela's offer.  (III J.A. 1131-1132.)

On September 24, 2010, Schottmiller sent Bush a letter responding to his September 15, 2010 letter refusing to schedule a meeting to focus on the EPO proposal.  (III J.A. 1133-1134.)  In her letter, Schottmiller again stressed the importance of the EPO issue to Prime Centinela and the need to resolve the issue so that Prime Centinela could appropriately plan for open enrollment.  (*Id*.)

Prior to the September 30, 2010 bargaining session, Schottmiller provided Bush with a directory of physicians who were included in the Prime network, noting that the lists had not yet been updated to include additional providers that had been nominated by Centinela employees.  (IV J.A. 1858-1886.)  The Union

showed up for the meeting late, but did make a proposal on the EPO plan. (III J.A. 1136-1137.)  However, the Union's proposal was substantially identical to the proposal the Union had made on June 14, 2010. (*Compare* II J.A. 663:23-670:17; III J.A. 1097-1098, 1136-1139.)  Most significantly, the Union's September 30, 2010 proposal continued to maintain zero premium contributions for all levels of coverage under the base EPO benefit as well as a provision creating an "open" network by permitting employees to obtain care from the Anthem network without receiving a referral from a Prime PCP. (III J.A. 1136-1137.)  In presenting its proposal, the Union reiterated that it did not believe employees should be required to pay premiums above what they were currently paying; in other words, free health insurance at all levels of coverage for the EPO base benefit. (I J.A. 187:21-190:5; II J.A. 658:23-659:10,663:23-670:17,723:23-726:8)  Moreover, while the Union's proposal purported to "accept" the EPO, because the Union's proposal maintained the ability of employees to receive care from providers affiliated with the Anthem network without a referral by a Prime PCP, the Union's purported "acceptance" of the EPO was illusory. (*Id*.)

Following a caucus, Prime Centinela presented its EPO/PPO proposal. ( III J.A. 1138.)  The proposal was substantially identical to the proposal Prime Centinela had made on July 23, 2010, with the exception that the low and high PPO options had been collapsed into a single PPO option.  Schottmiller also again

emphasized to the Union that health care was a single critical issue, and that Prime Centinela would not modify the Prime PCP referral component of the EPO Plan or the premium contribution amounts to be made by employees for base EPO coverage as specified in the proposal. (*See*, *i.e.*, I J.A. 201:3-203:3; II J.A. 663:23-670:17; V J.A. 2221.)

After another caucus, the Union made a "revised" proposal on Article 15 by modifying the proposal it had made earlier that day to delete a decrease in the copay for mental health services. (III J.A. 1140-1141.) The Union also reiterated that it would not agree to a closed network or requiring employees to pay premiums for coverage that they were not currently paying. (II J.A. 663:23-670:17; V J.A. 2223.)

The next bargaining session took place on October 21, 2010. (II J.A. 668:22-24.) At the meeting, Prime Centinela presented the Union with a complete package of proposals on all open items as its "final offer" to the Union, just as it had promised to do at the close of the September 30, 2010 meeting. (II J.A. 668:22-670:21.) The package included the EPO proposal that had been presented to the Union on September 30, 2010, as well as a return to two PPO options. (*Id.*) Schottmiller again explained to the Union that the EPO plan was the single critical issue in the negotiations, reviewed the fact that the parties had exchanged proposals during the course of negotiations without any movement from the Union,

and that even though the Union had included the EPO in its proposals, the Union had not changed its position of zero premium contribution for all levels of coverage under the plan.  (I J.A. 204:19-208:23, 212:12-18; II J.A. 668:22-670:21.) Schottmiller also again reiterated that there would be no collective bargaining agreement without the Union's agreement to the EPO as proposed by Prime Centinela, including the premium contribution rates set forth in the proposal.  (*Id.*) Schottmiller also explained that if the Union had any counterproposals it needed to make them prior to November 1, 2010 when open enrollment would begin at the Hospital.  (*Id.*)  Bush responded by again challenging Prime Centinela's assertion of impasse, but reiterating that it would not agree to any increases in premium costs above what employees were currently paying. Bush also repeated the Union's claim that the Union was concerned about the number of doctors in the Prime network and quality of care issues.  (*Id.*)  The Union made no counterproposals on Article 15.  (*See*, *i.e.*, I J.A. 204:19-208:23, 212:12-18; II J.A. 668:22-670:21; III J.A. 1142-1207; V J.A. 2221-2223.)

On October 22, 2010 Schottmiller provided Bush with a list of physicians affiliated with the Prime network that included physicians who had been added to the network as a result of nomination forms returned by Centinela employees ( V J.A. 1887-1908) and on October 29, 2010 she sent Bush a letter memorializing the status of negotiations, summarizing the bargaining history and indicating that

"CHMC and SEIU, UHW-West ("SEIU'') reached impasse following almost one year of bargaining, most of which focused on the new EPO and PPO plans previously implemented at other Prime Healthcare Hospitals with bargaining units represented by SEIU on January 1, 2010."  (III J.A. 1208-1211.)

On October 25, 2010 Bush sent Schottmiller another disingenuous request stating "In evaluating Centinela's health insurance proposal, it has come to my attention that while the Union the aggregate data concerning which health plans bargaining unit employees are currently enrolled (*i.e*., that three part-time bargaining unit employees are enrolled in the employee plus family base HMO plan), the Union does not presently have this information broken down by individual bargaining unit employees."    (V J.A. 1912-1929.)    Schottmiller provided the information to Bush the next day.  (*Id*.)

On November 1, 2010, Bush sent Schottmiller a letter repeating the Union's contentions that the parties were not at impasse, that Prime Centinela had been bargaining in bad faith throughout the negotiations, and that Schottmiller's recitation of the parties' bargaining history was "offensive."  (III J.A. 1212-1215.) Bush further demonstrated his gamesmanship by initiating an email exchange with Schottmiller on that same date in which he pressed Schottmiller for "clarification" regarding the "implementation" of Prime Centinela's health insurance proposal. (V J.A. 1932.)  Schottmiller responded the following day indicating that Prime

29

Centinela would be "implementing our final offer, provided to you on October 21, 2010 regarding the EPO and PPO plans, and employee contributions, on January 1, 2011. (*Id*.) During this period Bush also made additional requests for information, all of which were responded to by Schottmiller notwithstanding Bush's obvious gamesmanship. (*See*, *i.e.*, V J.A. 1933, 1934.) Schottmiller also provided Bush with an updated list of physicians affiliated with the Prime network as well as the open enrollment materials being provided to all Centinela employees. (V J.A. 1935-1967, 1968-2018.) Bush and Schottmiller also exchanged communications during which Schottmiller explained that while Prime Centinela was willing to schedule a meeting with the Union, its willingness to do so should not be interrupted as a waiver of Prime Centinela's contention that the negotiations were at impasse. (*See*, *i.e.*, V J.A. 2019-2021.)

**G.    The Union Rejects Prime Centinela's Final Concession To Achieve A New Collective Bargaining Agreement Prior To The January 1, 2011 Effective Date Of The EPO.**

In one final attempt to reach agreement on the EPO and other proposals, Prime Centinela provided the Union with an LBF on December 15, 2010. (III J.A. 1216-1272.) In its LBF, Prime Centinela advanced the date of certain pay raises that had been included in its October 21, 2010 proposal by more than six months. (*Id*.) Prime Centinela also advised the Union that this advancement would be withdrawn if its LBF was not accepted by December 31, 2010. Bush responded to

Prime Centinela's LBF with more gamesmanship and claiming that he did not understand how the Prime Centinela could "make a last, best, and final offer that changes after a certain date?"  (V J.A. 2022-2023.)  Despite Bush's obvious gamesmanship, Schottmiller answered his question.  (*Id.*) ("The modification to Article 13 was made in order to facilitate a final agreement prior to the end of the year. If the Union is not willing to agree to the Company's LBF within that time period the modification will be withdrawn. As an experienced negotiator I am sure you understand the statement in my letter.")  Approximately one week after this exchange Bush advised Schottmiller that the Union would not be responding to the LBF by December 31, 2010.  (III J.A. 1273-1274.)

On December 30, 2010, Bush sent Schottmiller a letter again claiming that the Union did not understand Prime Centinela's position and "request[ing] clarification regarding these proposals."  (III J.A. 1275-1278.)  Bush's December 30, 2010 letter also repeated many of the claims the Union had been making in prior communications relating to the status of negotiations and claimed that "the Union is willing and interested in continuing negotiations;" however, Bush's letter did not include any modifications to the Union's prior health insurance proposal, and most certainly did not agree to Prime Centinela's final EPO proposal made on October 21, 2010.  (*Id.*)

31

**H.    The Parties' Communications In 2011 Confirm The Continuing Existence Of The Impasse In Bargaining.**

Schottmiller responded to Bush's December 30, 2010 letter on January 13, 2011.  Schottmiller's response referenced the disingenuous claims that he did not understand Prime Centinela's position with respect to its LBF and specifically asked for confirmation of the Union's position on the more significant items included in the LBF.  (III J.A. 1279-1280, 1283-1285.)  Bush sent a response dated January 21, 2011 in which he once again repeated the Union's contentions that the negotiations were not at impasse and that "there is still much to negotiate in this contract and movement to be made by both parties."  (III J.A. 1281-1282.)  Bush's assertions were belied, however, by the fact that his letter refused to respond to any of the itemized requests set forth in Schottmiller's January 13, 2011 letter, as well as the portions of his letter recognizing that Prime Centinela was not moving off its LBF and cancelling the meeting scheduled for January 27, 2011.  (*Id*.) ("By announcing in no uncertain terms that you will not move from your last proposal and will not bargain with the Union, your actions caused the January 27, 2011 session to be cancelled.")  During the same period of time, the Union continued its corporate campaign attacking the quality of care provided at Centinela.  Despite the Union's tactics, however, Prime Centinela continued to provide the Union with requested information. (*See*, *i.e.*, V J.A. 2024-2032, 2033-2036, 2037, 2038-2045.)

32

Schottmiller responded on February 7, 2011, stating, *inter alia*:

> I was surprised and disappointed to receive your January 21, 2011 letter cancelling the parties' meeting previously scheduled for January 27. Part of my surprise was based on your December 30, 2010 letter in which you requested voluminous information, claiming that it was needed because the Union had questions concerning what you characterized as Centinela's "new" proposals.
>
> In response, Centinela devoted substantial resources towards gathering the information that had been requested. Centinela also looked forward to the opportunity to respond at the January 27
> session to any of the questions you claimed the Union had. Your January 21 letter cancelling that session illustrates, once again, that the Union's requests for information have not been made in good faith. It also illustrates that the Union is not truly interested in discussing the "new" proposals.
>
> Additionally, your January 21 letter further illustrates the impasse that exists in these negotiations. First, your letter failed to address the very specific and straight-forward questions enumerated in my January 13, 2011 letter to you. We believe that the Union's failure to respond not only confirms the impasse in the negotiations but also constitutes an unfair labor practice by the Union. Although you claim in your letter that there is "movement to be made by both parties," we have tried to make clear to the Union that Centinela will not make any changes to the substantive terms and fundamentals of its proposals on which agreement has not been reached. For its part, the Union has not agreed to those proposals, as is exemplified by your January 21 letter. Centinela therefore continues to believe that the negotiations are at impasse, despite the Union's hollow claims that it is prepared to modify its positions.

> Moreover, even if the Union is in fact prepared to modify its positions, let me reiterate that Centinela is not prepared to, and will not, move off of the fundamentals of its positions and proposals. Unless and until the Union is prepared to agree to those fundamentals and to enter into a collective bargaining agreement confirming its agreement to them, the negotiations between the parties will remain at impasse. The Union had the opportunity to agree to the fundamentals of Centinela's proposals by answering "Yes" to each of the questions enumerated in my January 13 letter. Unfortunately, no such agreement was articulated in your January 21 letter. We urge the Union to reconsider its prior positions and to now accept Centinela's proposals.

(V J.A. 2046-2047.)

The parties held their next meeting on March 29, 2011.  During the course of the meeting both parties essentially restated the same positions which they had been communicating to each other since April 2010 when Prime Centinela first advised the Union, in writing, of the critical nature of Prime Centinela's EPO Plan to the ability of the parties to successfully negotiate a new collective bargaining agreement.  (II J.A. 422:8-25; 674:23-678:2.)  The Union did not indicate it was prepared to agree to Prime Centinela's EPO plan, or to accept the other proposals included within Prime Centinela LBF; in fact, the Union did not even make a proposal on health insurance during the meeting.  (*Id.*) Following a caucus Prime Centinela advised the Union that unless the Union was prepared to agree to Prime Centinela's LBF there was no need to meet any further.  (*See*, *i.e.*, V J.A. 2227.)

By letter dated April 20, 2011 to Schottmiller, Bush set forth the Union's version of what had occurred during the March 29, 2011 meeting, including an extended discussion "significant changes" allegedly made by the Union to certain proposals.  (III J.A. 1302-1304.) Schottmiller responded by letter dated April 29, 2011 in which she reiterated that unless and until the Union was ready to accept the fundamentals of Prime Centinela's LBF, and particularly the EPO as contained in the LBF, further meetings between the parties would be fruitless.  (III J.A. 1305-1307.)

There were no communications between the parties following Schottmiller's April 29, 2011 letter until October 2011 when Ruppert, who had assumed the role of chief negotiator for the Union in place of Bush, contacted Schottmiller to schedule a meeting.  (II J.A. 678:5-19.)  The communications between the parties thereafter *(see, i.e.*, III J.A. 1308, 1309, 1310-1311, 1312-1313, 1314-1315, 1316-1317, 1318-1324, 1325, 1326, 1327, 1328.) only served to deepen the impasse inasmuch as the Union made no movement to accept the EPO plan or other items in Prime Centinela's LBF that had been specifically referenced in Schottmiller's January 13, 2011 letter, and Prime Centinela showed no willingness to concede on any of those items.

I.     **Procedural History.**

The Union filed a series of charges in this matter, and counsel for the Acting General Counsel issued the consolidated complaint on April 27, 2012, alleging that Prime Centinela violated Section 8(a)(1) and (5) of the Act by refusing to provide information and refusing to negotiate in good faith.  (II J.A. 756-840.)

The matter proceeded to trial before Administrative Law Judge ("ALJ") Gerald M. Etchingham in Los Angeles, California, commencing July 30, 2012 and concluding August 3, 2012.  During trial the parties reached a partial settlement agreement, which the ALJ approved.  (II J.A. 413:9-415:10.)  As a result the Regional Director withdrew paragraphs 9-12 and 17 of the Complaint.  (*Id.*)  The General Counsel does not allege or plead an independent 8(a)(1) violation for failure to provide information.  (*Id.*)

On April 12, 2013, the ALJ issued its decision and recommended order. Prime Centinela filed exceptions to the order.

On November 24, 2015, the Board issued the Order that is the subject of this Petition, affirming the ALJ's rulings, findings and conclusion and adopting the Order as modified.  The Board held that Prime Centinela violated Section 8(a)(5) and (1) of the Act by failing to provide the Union with information requested in its July 23, 2010 letter, and that Prime Centinela failed to establish that the parties had reached impasse before implementing its healthcare changes.  In so holding, the

36

Board departed from established precedent without reasoned justification and improperly affirmed the ALJ's findings despite a lack of supporting substantial supporting evidence on the record when considered as a whole. Accordingly, Prime Centinela filed this Petition for Review.

On February 5, 2016, the NLRB filed a Cross-Application for enforcement of the Board's Order.

## SUMMARY OF ARGUMENT

In this case, Prime Centinela and the Union negotiated over a successor collective bargaining agreement for over a year. During the course of those negotiations, Prime Centinela continuously insisted on its proposal to provide health insurance though through its corporate parent's own network and to require employees to pay premiums for that insurance, and that there would be no collective bargaining agreement without the inclusion of that proposal in the agreement. Just as adamantly, the Union insisted that Prime Centinela provide health insurance coverage through an outside fully-funded health care network and that employees pay nothing for coverage.

The law has long established that the obligation to bargain in good faith under the Act does not compel either party to agree to a proposal or require the making of a concession. It is equally clear that under the law the firmness of a bargaining position does not constitute bad faith. Importantly for this case, it is

37

well settled that the Act does not require futile negotiations.  Instead, where the meetings previously held give ample reason to believe that no useful progress can be made toward a total agreement, neither party is required to bargain further, and impasse has occurred.  Application of this well settled law to the substantial evidence in this case can only lead to one conclusion—that Prime Centinela did not violate the obligations imposed by the Act and that the Board's Order must be reversed.

## STANDING

Prime Centinela has standing to bring this Petition for Review pursuant to 29 U.S.C. § 160(f), which states that any person aggrieved by a final order of the Board may obtain a review of such order.  This Court has held that "standing to appeal an administrative order as a 'person aggrieved,' 29 U.S.C. § 160(f), arises if there is an adverse effect in fact, and does not . . . require an injury cognizable at law or equity."  *Retail Clerks Union, etc. v. NLRB*, 348 F.2d 369, 370 (D.C. Cir. 1965).  In this case, Prime Centinela is aggrieved by the Board's Order.  The Order has an "adverse effect in fact" on Prime Centinela, as the Board ordered Prime Centinela to rescind a healthcare plan that Prime Centinela believes is lawful and to inform its Centinela Hospital employees that it has violated their rights under federal law.  (V J.A. 2299-2300.)  Prime Centinela thus has standing under *Retail Clerks Union*.

## ARGUMENT

**A.     Standard of Review.**

The NLRB's legal conclusions are reviewed *de novo*, and its interpretations of the NLRA are upheld only if they are rational and consistent with the Act. *Litton Fin. Printing v. NLRB*, 501 U.S. 190, 201 (1991).  This Court will "set aside an order [of the NLRB] 'when the Board has failed to apply the proper legal standard . . . or when it has departed from established precedent without reasoned justification."  *Mail Contractors of America v. NLRB*, 514 F.3d 27, 31 (D.C. Cir. 2008), *quoting Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 446 (D.C. Cir. 2004).

**B.     The NLRB Applied the Wrong Legal Standards and Improperly Departed from Established Precedent.**

**1.     The Board Erred In Concluding That Prime Centinela Unlawfully Failed to Provide Relevant Information Request By The Union On July 23, 2010.**

The ALJ's determination that Prime Centinela violated Section 8(a)(5) and (1) of the Act by failing to provide the Union with information requested in its July 23, 2010 letter, which adopted by the NLRB, is not supported by substantial evidence on the record when considered as a whole.

In support of this conclusion the ALJ finds, incredibly, that there is no evidence to support Prime Centinela's contentions that the Union's requests were made to assist in the Union's corporate campaign, to stall negotiations, or to

frustrate the collective bargaining process and implementation of the Prime EPO Plan. (*See*, *i.e.*, V J.A. 2275:27-30.) The ALJ attempts to support these findings by other equally dubious findings, including that it is not relevant when assessing Prime Centinela's refusal to provide the requested information whether the Union was seeking the information for any of the purposes set forth in the preceding sentence or that members of the Union employed at Garden Grove and Encino are enrolled in the Prime EPO Plan. (*See*, *i.e.*, V J.A. 2275:34-2277:2.) The ALJ also based his conclusion that all of the information requested was relevant and not confidential, including such items as the names of the coding consultants working for Prime, based on the Union's claims that the items were relevant. (*See*, *i.e.*, V J.A. 2273:21-48.) Neither the ALJ's analysis nor his conclusions can be supported by the record in this case.

> **a.** **The Board's Conclusion That Prime Centinela Violated The Act By Failing To Provide The Union With All Information Requested By Its July 23, 2010 Letter Is Contrary To The Law And The Facts.**

An employer violates Section 8(a)(5), which provides that it shall be an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees," only if the information that has been requested by the union is relevant and necessary to a union's representational obligations under the Act. *See*, *i.e.*, *Detroit Edison Co. v. NLRB*, 440 U.S. 301 (1979); *NLRB v. Acme Industrial Co.*, 385 U.S. 432 (1967); *NLRB v. Truitt Manufacturing Co.*, 351

U.S. 149 (1956). As explained by the Eighth Circuit, an employer's failure to furnish relevant materials upon request may violate Section 8(a)(5) if the withholding of the information "conflicts with the statutory policy to facilitate effective collective bargaining." *Procter & Gamble Co. v. NLRB*, 603 F.2d 1310, 1315 (8th Cir. 1979).

Accordingly, an employer's refusal to provide even relevant information is not a *per se* violation of Section 8(a)(5); all the relevant circumstances must be evaluated when determining whether the information is necessary for collective bargaining. As stated by the Supreme Court in *Detroit Edison*, "[t]he duty to supply information under § 8(a)(5) turns upon 'the circumstances of the particular case' . . . and much the same may be said for the type of disclosure that will satisfy that duty." 440 U.S. at 314 (quoting *NLRB v. Truitt Mfg. Co.*, 351 U.S. at 153). As stated by the Court in more detail in *Truitt*, "We do not hold, however, that in every case in which economic inability is raised as an argument against increased wages it automatically follows that the employees are entitled to substantiating evidence. Each case must turn upon its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met." *Id.*, 351 U.S. at 153-154. It is therefore established that an employer's failure to provide requested information

41

violates the Act only if the withholding of the information frustrates effective collective bargaining.

Primary among the requirements that trigger the statutory duty to furnish requested information is that the information be "relevant" either to the union's negotiation of a collective bargaining agreement or to the union's policing of such an agreement. *General Electric Co. v. NLRB*, 916 F.2d 1163, 1168 (7th Cir. 1990). It is settled law that an employer is duty bound to provide information needed by the union to assess claims made by the employer relevant to contract negotiations. *Aramark Corporation*, 353 NLRB 993 (2009). In order for the obligation to furnish information to attach there must be a request made and the information requested must be relevant to the union's collective bargaining need. *Saginaw Control & Engineering, Inc.*, 339 NLRB 541 (2003). A union's "bare assertion" of relevance does not automatically oblige the employer to supply all the information in the manner requested. *Detroit Edison Co. v. NLRB*, 440 U.S. at 304. Where the union fails to "affirmatively demonstrate relevance, the employer is relieved of its Section 8(a)(5) duty to provide the information." *Coca-Cola Bottling Co.*, 311 NLRB 424, 425-426 (1993); *General Electric Co.*, 916 F.2d at 1171. The union must make an affirmative showing of relevance at the time the request is made or upon the employer's challenge to relevancy, as relevancy must

be established within "the fact situation presented to the company at the time it acted." *A.S. Abell Co.*, 624 F.2d 506, 513, n.5 (4th Cir. 1980).

When a union's request for information concerns data about employees or operations other than those represented by the union, or data on financial, sales, and other information, there is no presumption that the information is necessary and relevant to the union's representation of employees. *Ohio Power Co.*, 216 NLRB 987 (1975), *enfd.* 531 F.2d 1381 (6th Cir. 1976). Rather, the union is under the burden to establish the relevance of such information. *Bohemia, Inc.*, 272 NLRB 1128, 1129 (1984); *see also Peterbilt Motors Co.*, 357 NLRB No. 13, slip op. at 2 (2011) ("Information concerning extra-unit matters is not presumptively relevant."), petition for review denied sub nom. Because the requested information was not presumptively relevant, the employer's duty to respond is conditioned on the union's disclosure of facts sufficient to demonstrate relevance, unless the factual basis was readily apparent from the surrounding circumstances. *Hertz Corp. v. NLRB*, 105 F.3d 868 (3d Cir. 1997).

Here, the Union's July 23 Request sought PEPPER reports, communications with the State of California concerning those reports, and, for all hospitals in the Prime network, information including payor-claims data, documents related to pressure ulcers and rates of septicemia and other infections, communications with government agencies concerning those medical conditions, coding and training

guidelines and communications concerning them, charts for patients diagnosed with septicemia, and a list of all nurse practitioners and physician assistants who serve as hospitalists. In making these requests, the Union sought information concerning matters plainly outside the Centinela bargaining unit. Accordingly, Prime Centinela was not obligated to provide the requested information unless and until the Union disclosed facts sufficient to demonstrate relevance. "Mere incantations" or "bare suspicions" of potential relevance are insufficient to trigger an employer's duty to provide information. *U.S. Postal Serv.*, 308 NLRB 1305, 1311 (1991). As demonstrated herein, the Union failed to meet its burden.

Thus, even if relevant, an employer's failure or refusal to provide information does not necessarily violate Section 8(a)(5). In determining whether a violation has occurred, the Board will assess the extent to which the information is relevant, and will dismiss an allegation if the information at issue is not sufficiently relevant to have impeded the union in discharging its statutory obligations under the Act. This principle is made clear in *Columbus Products Company*, 259 NLRB 220 (1981):

> Our dissenting colleague correctly states the rule requiring an employer to provide information which is of probable or potential relevance to the proper performance of the duties of a collective bargaining representative. However, the rule is not per se, and in each case the Board must determine whether the requested information is relevant, and if relevant, whether it is sufficiently important or needed to invoke a statutory obligation of

44

> the other party to produce it. Tool and Die Makers'
> Lodge No. 78, IAM, AFL-CIO (Square D Company,
> Milwaukee Plant), 224 NLRB 111 (1976).
>
> We find, in agreement with the Administrative Law
> Judge, that the information here requested is not of such
> significance or necessity to warrant a finding that the
> refusal to provide it violates the Act.

*Id.* at n.1.

Moreover, because the Act mandates that both the employer and the union "confer in good faith," a union is also bound by good faith obligations in its dealings with the employer. *Local 13, Detroit Newspaper Printing and Graphic Communications Union v. NLRB*, 598 F.2d 267, 271 (D.C. Cir. 1979). For this reason, a union's request for information must be made in good faith and for the purpose of facilitating good faith bargaining. If the union's information request is intended to frustrate bargaining or is made for some other inappropriate purpose, such as to create an unfair labor practice charge or stall negotiations and impasse, then the employer is relieved of whatever obligation it might otherwise have to provide the information. *ACF Industries*, 347 NLRB at 1043; *Coca-Cola Bottling Co.*, 311 NLRB at 425-26; *Wachter Construction Co. v. NLRB*, 23 F.3d 1378 (8th Cir. 1994); *Graphic Comm. Intl. Union v. NLRB*, 977 F.2d at 1170.

Here, the substantial evidence demonstrates that the Union's information request was a deliberate tactic to slow down bargaining, harass Prime Centinela, assist the Union's corporate campaign against Prime, and/or forestall

implementation of the Prime EPO Plan and premium sharing by Prime Centinela. Prime Centinela had made the Union aware that there would be no contract without the EPO Plan, including the PCP requirement and employee premium sharing, months before the Union sent its July 23 Request. At no time did Prime Centinela indicate that it would revise its position. Moreover, by the time the Union made its July 23 Request, employees at Garden Grove and Encino—represented by the Union—had already been in the Prime EPO for more than 6 months, and there is no evidence whatsoever that any of those employees were dissatisfied with the "quality of care" provided to them by physicians and facilities in the Prime network. (III J.A. 1105-1108, 1109-1112, 1115-1118.) The ALJ's decision— adopted by the NLRB—discounts these facts by citing *Peterbilt Motors Co.*, 357 NLRB No. 13 (2011) and contending that the Union's request was "no different than any other bargaining situation where a union wants to know information about other employer plant locations." (V J.A. 2276:33-41.) Yet, the ALJ ignored the evidence that the information requested by the Union was the exact type of information that the Union was already using in making accusations to law enforcement, regulatory agencies, and the general public that Prime was engaged in fraudulent/criminal billing practices or was providing woefully substandard patient care, as well as the fact that the Union's attempt to obtain the same type of information in November 2009, there was significant delay between when the

46

Prime EPO Plan was proposed to the Union and its July 23 Request, and Prime Centinela stated on multiple occasions during the preceding several months that there would be no final collective bargaining agreement without agreement to the Prime EPO Plan.

The law requires that in assessing whether an employer committed a violation of Section 8(a)(5) by failing to provide information necessary for effective collective bargaining, each request for information and the employer's response thereto must be evaluated in light of all the facts and circumstances involved. Here, the substantial evidence of the totality of the facts and circumstances make clear that the Union's requests were made for tactical reasons, and thus Prime Centinela's failure to provide the information was both fully justified and had no impact on the outcome of these negotiations. Accordingly, the Board's decision that Prime Centinela violated the Act by failing to provide the Union with information requested in its July 23, 2010 letter must be reversed.

### 2. Contrary to the NLRB Decision, The Parties Were At Impasse When Prime Centinela Implemented the EPO Plan.

It is well settled that the Act does not require futile negotiations. Where the meetings previously held give ample reason to believe that no useful progress can be made toward a total agreement, neither party is required to bargain further. *Redburn Tire Co.*, 358 NLRB No. 109 (2013); *Litton*, 300 NLRB 324, 333 (1990); *Whittier Area Parents' Ass'n*, 296 NLRB 817, 831 (1989). Impasse will be found

47

where there are irreconcilable differences in the parties' positions and they have exhausted the prospect of concluding a final and complete collective bargaining agreement. *E.I. DuPont & Co.*, 268 NLRB 1075 (1984). Said differently, "[a] bargaining impasse occurs when good faith negotiations have exhausted the prospects of concluding an agreement and the parties have reached that point of time in negotiations when they are warranted in assuming that further bargaining would be futile." *Comau, Inc. v. NLRB*, 671 F.3d 1232, 1237 n.10 (D.C. Cir. 2012)(internal alterations and quotations omitted).

Importantly, impasse "cannot be said to be an unexpected, unforeseen, or unusual event in the process of negotiations since no experienced negotiator arrives at the bargaining table with absolute confidence that all of his proposals will be readily and completely accepted." *Hi-Way Billboards*, 206 NLRB at 23. Where the parties have declared their positions and neither party will concede to the other, impasse has been reached. *Bloomsburg Craftsmen*, 276 NLRB 400, 405 (1985). This is particularly true where neither party has expressed any genuine willingness to concede to the other party's position in exchange for movement on other items. *See*, *i.e.*, *E.I. DuPont & Co.*, 268 NLRB at 1076.

Because a determination of impasse requires a determination of whether further negotiations would be futile because of the fixed and different positions of the parties, all relevant circumstances surrounding the parties' negotiations must be

48

assessed and no one factor, nor any combination of factors, is determinative. *See*, *i.e.*, *Lou Stechers Super Markets*, 275 NLRB 71 (1985); *Bio-Science Laboratories*, 209 NLRB 796, 797 (1974).  For example, the Board will consider any pressing business or operational needs when determining whether impasse had been reached.  *Bell Transit Co.*, 271 NLRB 1272 (1985).  An employer may also be entitled to set a time limit by which the union negotiators must agree to its proposals or it will consider impasse to have been reached if circumstances warrant such action.  *Financial Institution Employees Local 1182 v. NLRB*, 750 F.2d 757 (9th Cir 1985). Critically, the Board will not hesitate to find a lawful impasse where the union is seeking to stall negotiations or engages in other tactics to forestall impasse. *See*, *i.e.*, *Matanuska Electrical Assn.*, 337 NLRB 680.

The law is clear that it is unnecessary for the parties to be deadlocked on every bargaining issue before a declaring impasse in the contract negotiations as a whole.  Instead, a fixed determination by one party or the other not to yield on one or more major items is enough to create an impasse in the negotiations as a whole, even if there are other proposals or issues that remain "open" and might be resolved through further discussions.  *California Pacific Medical Center*, 356 NLRB No. 159; *Matanuska Electrical Assn.*, 337 NLRB 680; *CalMat Co*., 331 NLRB 1084 (2000); *Georgia-Pacific Corp.*, 305 NLRB 112, n.2 (1992); *Hyatt Regency Memphis*, 296 NLRB 289, 316 (1989), *overruled on other grounds by*

*McClatchy Newspapers*, 321 NLRB 1386 (1996); *Western Publishing Co.*, 269 NLRB 355 (1984); *E.I. DuPont & Co.*, 268 NLRB at 1076.  Accordingly, parties are not required to bargain to impasse on all mandatory issues when stalemate on one issue of importance cripples the prospects of a final, complete agreement.  *Id.*

> **a.    The Uncontroverted Evidence Supports Prime Centinela's Determination That The Parties Were At Impasse.**

The NLRB's holding that the parties had not reached impasse when, on January 1, 2011, Prime Centinela implemented the EPO Plan in substitution of the prior Anthem HMO plan is not supported by substantial evidence in the record considered as a whole.  Prime Centinela first informed the Union that having Centinela join all other Prime hospitals in the EPO Plan program was an urgent issue of utmost importance during negotiations and communications between the parties in February 2010.  (*See*, *i.e.*, T 575:7-576:25;V J.A. 2165 .)  Prime Centinela reiterated the urgency to the Union by its March 26, 2010 email offering to suspend the premium sharing portion of its EPO Plan proposal in order to allow implementation of the rest of the EPO Plan on July 1, 2010 when the HMO policy with Anthem expired.  (III J.A. 932.)  It did so twice more in follow-up emails within the next several days.  (*See* IV J.A. 1502, 1503, 1504, 1505.)  The Union ignored these communications for over three weeks, then dismissively rejected Prime Centinela's offer.  (III J.A. 933.)  Prime Centinela immediately responded to the Union's rejection, confirming again that Prime Centinela was willing to forego

premium sharing while the parties continued to negotiate if the Union would otherwise agree to implementation of the EPO Plan and that the out-of-pocket costs for employees would be reduced if the Union agreed to do so. (IV J.A. 1506.) Prime Centinela also asked the Union for any ideas on how to resolve the issue. (*Id*.) The Union failed to respond. On April 23, 2010 Prime Centinela emphasized, in writing, that no collective bargaining agreement was possible without the Union's agreement to the proposed EPO Plan. (III J.A. 934-936) ("we have offered the Union everything we have to offer on this subject" and "a final, complete contract is dependent on resolving this issue"). On numerous occasions thereafter, Prime Centinela reiterated that no contract would be possible without the EPO Plan. (II J.A. 634:7-13.) In response, the Union consistently and adamantly refused to accept the EPO Plan, both in concept and in practical application. (II J.A. 634:25-635:9.)

Furthermore, although Prime Centinela consistently raised the issue, between March 26, 2010 and the implementation on January 1, 2011, the Union made only two substantive proposals during that timeframe addressing health insurance. (III J.A. 1136-1137, 1140-1141.) Crucially, both of those proposals included an "open" Anthem network option and zero premiums for all levels of coverage provided by the EPO Plan, positions that the Union knew would never be accepted. (*Id*.) Throughout this period the Union also continuously engaged in

51

various evasive tactics signaling that it had absolutely no intention of ever agreeing to Prime Centinela's EPO Plan, including delayed responses to communications stressing the urgency of the issues, refusing to cooperate in Prime Centinela's efforts to expand the Prime network of providers, requests for voluminous information, claiming at the eleventh hour that additional information was required to analyze Prime Centinela's proposal, and general stalling in an effort to either force Prime to capitulate by renewing the Anthem policy, without any premium support from employees, or to set up bad faith bargaining allegations. (II J.A. 631:14-639:2.)

The Board's Decision finds that impasse was precluded by the fact that the Union did not receive the information sought by its July 23 Request and that the totality of the circumstances fails to show that the parties reached impasse. (V J.A. 2279:45-2281:2; 2287:37-40.) The Decision also finds no impasse because the Union consistently took the position that there was no impasse because, for example, the bargaining sessions "were not so numerous as to indicate that the parties would have reached 'the end of their rope,'" the parties made proposals on other subjects subsequent to implementation of the EPO Plan, and the parties continued to meet and the Union continued to modify its proposals on open issues other than the EPO Plan after implementation. (V J.A. 2298.) However, the

52

Decision's conclusions are not supported by substantial evidence on the record when considered as a whole.

Specifically, the totality of the credible evidence in the record establishes that the Union's July 23 Request was made by the Union to obtain information in support of its corporate campaign against Prime, to otherwise harass Prime Centinela, or to stall negotiations so that employees would continue to receive free health insurance under the Anthem HMO plan. Particularly instructive regarding the Union's tactics is *Graphic Comm. Int'l Union v. NLRB*, 977 F.2d 1168, where the court discussed the abuse of information requests in order to avoid impasse and implementation of an employer's proposals demanding union concessions:

> The union may want the information in the hope that the company will refuse its demand, thereby handing the union a legal issue that may enable it to convert an economic strike into an unfair labor practice strike and thus get its members reinstated when the strike is over. Or the union may want the information simply in order to delay the evil day on which the company cuts the workers' wages and fringe benefits; and the threat of delay may cause the company to moderate its demands.

> The third point will bear some elaboration. The possibility of delay arises because the company can unilaterally institute changes in the wages and working conditions of its workers as soon as bargaining reaches a dead end ("impasse"). [Citations omitted]. The longer that takes, the longer the workers will continue to receive the benefits of the superior terms of the existing contract. And the bargaining will take longer the more information

53

> the company has to disclose, especially if the information
> provides a basis for further discussion.

*Id*. at 1170.

Moreover, the assertion made by the Union and adopted by the ALJ that the Union needed the information because Prime Centinela's EPO Plan proposal would not allow employees to obtain medical services from Anthem without a referral from a Prime PCP is belied by evidence in the record including the Union's November 2009 request seeking the same type of information, the Union's delay in requesting the information for many months after Prime Centinela informed it that the EPO Plan included the PCP requirement, and that the fact that no employee ever raised any issue about the quality of care that they provided to Centinela's patients during the course of their duties.   (II J.A. 660:24-663:13.) Moreover, nowhere in his letters and emails addressing the information request did Bush ever reference the "gatekeeper" or referral requirement.   The Union also never agreed to the premium sharing component of Prime Centinela's EPO Plan proposal, nor did the Union ever waver from its position, announced as early as December 2009 and reiterated throughout the entirety of 2010, that the base plan medical insurance must be provided free of charge for all levels of coverage. And the Union's information request had nothing to do with this issue, which also was undeniably at impasse. *See*, *i.e.*, *Peterbilt Motors Company*, 357 NLRB No. 13 (2011), cases cited therein.  Critically, the Union agreed to the EPO Plan at Garden

Grove and Encino.  (III J.A. 1099-1102, 1103-1104.)  There is no evidence, let alone substantial evidence, to support the inference that the Union may have agreed to the EPO Plan, including both the PCP requirement and premium sharing by employees, if Prime Centinela would have provided the Union with all information requested by the Union's July 23 letter.    Accordingly, Prime Centinela was justified in declaring impasse here.

The ALJ's decision (and the Board's Order adopting the same) credits the Union's assertions of "no impasse" without explaining why it simultaneously ignores Prime Centinela's assertions statements that the parties were at impasse. While the Board law sometimes references that "both parties must believe that they are at the end of their rope" in order for impasse to be established, *see*, *i.e.*, *AMF Bowling Co*., 314 NLRB 989, 978 (1994), this principle does not permit a union to defeat a finding of impasse simply by declaring that impasse has not occurred. Moreover, Prime Centinela did much more that simply say "impasse;" as set forth above, it repeatedly explained to the Union that without agreement on the EPO Plan there would be no collective bargaining agreement.   Absent conclusive evidence that one party is willing to concede to the fundamentals of the other party's position, impasse will be found, notwithstanding such "gamesmanship." *See*, *i.e.*, *Holiday Inn Downtown - New Haven*, 300 NLRB 774 (1990); *Bloomsburg Craftsmen*, 276 NLRB at 405; *E.I. DuPont & Co.*, 268 NLRB at 1076.

Here, there is absolutely no credible evidence that the Union was willing to concede to the fundamentals of Prime Centinela's EPO Plan proposal.

The Board's finding that Prime Centinela could not lawfully implement its EPO Plan proposal because there were other open items and that the Union continued to make proposals on items other than the EPO Plan subsequent to implementation have no reasonable basis in Board law or the Act. When a particular issue or issues is so important to a party to negotiations that the party will not agree to a final contract unless that issue is resolved in its favor, impasse on that single critical issue allows implementation. *Georgia-Pacific Corp.*, 305 NLRB 112, n.2 (1992). A deadlock is still a deadlock, whether produced by one or by a number of significant and unresolved differences on "major items." *E.I. DuPont & Co.*, 268 NLRB at 1076. Precluding implementation in the event of unresolved issues would result in marathon negotiations over other issues that, even if resolved, would not result in a collective bargaining agreement. For good reason, the law does not require such futile acts. *See*, *i.e.*, *NLRB v. American Nat'l Ins. Co.*, 343 U.S. at 404 ("[I]t is now apparent from the statute itself that the Act does not encourage a party to engage in fruitless marathon discussions at the expense of frank statement and support of his position.") Moreover, matters occurring subsequent to the date of implementation are not relevant to assessing the status of negotiations at the time of implementation, which is when the

56

negotiations must be at impasse for the implementation to be permissible. Even if post-implementation conduct was relevant, the evidence shows that Prime Centinela never modified its EPO Plan proposal or its position that there could be no final collective bargaining agreement without agreement on the EPO Plan during the post-implementation period, and the Union never agreed to the EPO Plan during that period. (III J.A. 1279-1280, 1283-1285, 1308, 1309, 1310-1311, 1312-1313, 1314-1315, 1316-1317, 1318-1324, 1325, 1326, 1327, 1328.) Critically, and without explanation, both the ALJ and the Board ignore that the Union's own bargaining notes from the parties' September 30, 2010 meeting confirm the Union's acknowledgment of impasse prior to implementation, without regard to the information requested by the Union's July 23 letter:

12:50 Resumed

Article 15

> Danny = What is not going to change from our proposal is the move off the employee being able to select from either the Prime or Anthem network. Secondly, we still feel strong about the EPO coverage being free to employee and family. In light of what I just   said how do we move forward.

(V J.A. 2161.)

In sum, when the record is properly considered as a whole, the substantial evidence indicates that Prime Centinela was not recanting from the two primary components of its proposed EPO Plan under any circumstances, and the Union was

57

not going to agree to the proposal under any circumstances. Accordingly, implementation of the EPO Plan was privileged by impasse and the Board's decision must be reversed.

## CONCLUSION

Petitioner Prime Centinela respectfully requests that the Court decline to enforce the Board's Order, as the Board failed to apply existing precedent to the facts of this case in a rational manner consistent with the Act. The Board's determinations that Prime Centinela violated the Act by failing to provide the Union with all information requested by its July 23, 2010 letter and that the parties had not reached a valid impasse when Prime implemented its healthcare proposal on January 1, 2011 are not supported by substantial evidence and have no reasonable basis in law. In so holding, the Board ignored substantial evidence that contradicted the ALJ's decisions and departed from establish precedent without justification. For these reasons, the Board's Order must be set aside.

Dated:  August 12, 2016

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By      /s/ Jason W. Kearnaghan
        Jason W. Kearnaghan, Bar No. 59804
        Sheppard, Mullin, Richter & Hampton, LLP
        A Limited Liability Partnership
        Including Professional Corporations
        333 South Hope Street, 48th Floor
        Los Angeles, California  90071-1448
        Telephone: (213) 620-1780
        Facsimile:    (213) 620-1398
        jkearnaghan@sheppardmullin.com

        Counsel for Petitioner and Cross-Respondent
        Prime Healthcare Centinela, LLC d/b/a
        Centinela Hospital Medical Center

59

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [ X ] this brief contains [*13,670*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

   [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: August 12, 2016            /s/ Jason W. Kearnaghan
                                  *Counsel for Petitioner/Cross-Respondent*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 12th day of August, 2016, I caused this Brief of

Petitioner/Cross-Respondent to be filed electronically with the Clerk of the Court

using the CM/ECF System, which will send notice of such filing to the following

registered CM/ECF users:

      Linda Dreeben
      Robert J. Englehart
      Amy H. Ginn
      NLRB, APPELLATE AND SUPREME COURT LITIGATION BRANCH
      1015 Half Street, SE, Suite 8100
      Washington, DC  20570
      (220) 273-2960

      *Counsel for Respondent/Cross-Petitioner*

      David A. Rosenfeld
      Bruce Harland
      WEINBERG ROGER & ROSENFELD
      1001 Marina Village Parkway
      Alameda, California  95401
      (510) 839-6600

      *Intervenor for Respondent*

                      /s/ Jason W. Kearnaghan
                      *Counsel for Petitioner/Cross-Respondent*